

FILED

Mar 17 2016, 7:57 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

| | |
|---|---|
| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| Ana M. Quirk<br>Muncie, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Frances Barrow<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Norma Jackson,<br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Adult Protective<br>Services,<br>*Appellee-Petitioner* | March 17, 2016<br><br>Court of Appeals Case No.<br>18A02-1508-MI-1075<br><br>Appeal from the Delaware Circuit<br>Court<br><br>The Honorable Linda Ralu Wolf,<br>Judge<br><br>Trial Court Cause No.<br>18C03-1504-MI-44 |

**Mathias, Judge.**

[1] Norma Jackson ("Jackson") appeals a protective services order issued by the Delaware Circuit Court requiring her to receive twenty-four-hour care and supervision at a nursing facility. Jackson argues that Adult Protective Services ("APS") failed to present sufficient evidence that she was an "endangered

adult" and that a life threatening emergency existed under Indiana Code section 12-10-3-28.

[2] We reverse and remand for proceedings consistent with this opinion.

## Facts and Procedural History

[3] On April 9, 2015, while driving, Jackson hit a small pine tree across the street from her home. The accident caused extensive damage to Jackson's vehicle, and it was towed away by a wrecking company. Jackson was not injured in the accident, but she could not remember what happened to her car the next day, so she called the police approximately twenty times asking for its location. The police explained to her that it was towed by a wrecking company. Jackson was clearly confused by this answer, and she continued to call the police about the location of her car. She eventually told the police that they had no right to tow her car. Jackson also repeatedly asked the police if her car had been repaired. and they responded that she would have to contact her insurance company about that.

[4] After this incident, and because of Jackson's repeated calls, on April 11, 2015, the Muncie Police Department decided to conduct a welfare check on Jackson. Jackson was eighty-one years old and living alone at this time.[1] When the police arrived at her residence, Jackson would not let the officers in her home because

---

[1] Jackson is now eighty-two years old.

she did not know them. Through her locked screen door, the officers asked Jackson to name the day. Jackson responded that she did not have any need to keep track of the days. The officers also asked her to name the current mayor of Muncie, to which she responded, "Who cares." Appellee's App. p. 10. The police asked Jackson to name the current president of the United States, as well. Jacksons stated that she thought it was Barack Obama but was not sure if he was still President.

Based on this interaction, the officers believed that Jackson would benefit from a psychological evaluation. After an hour of talking to Jackson through the screen door, a helicopter flew overhead. When Jackson stepped out onto the porch to look at the helicopter, officers blocked her entry back into the home. The officers then loaded Jackson into the ambulance, and she was taken to IU Health/Ball Memorial Hospital. Jackson was admitted to the Gero-Psychiatric Unit of Meridian Services at the hospital.

That same day, Meridian Services submitted an application for emergency detention of a mentally ill and dangerous person which stated that Jackson had a "psychiatric disorder that substantially disturbed her thinking, feeling or behavior and impaired her ability to function." Appellee's App. p. 3. The application also indicated that Jackson was gravely disabled and in need of immediate restraint because of "increased confusion, poor tracking, substantial impairment in judgment/reasoning." *Id.*

In the corresponding physician's statement submitted to the mental health court on April 15, 2015, Doctor Abdulmalek Sadehh ("Dr. Sadehh") stated that Jackson was suffering from a psychiatric disorder, specifically "Dementia NOS [not otherwise specified] most likely Alzheimer's type." *Id.* at 6. Dr. Sadehh also noted that Jackson had poor short-term memory, poor insight and impaired judgment, and was unable to manage some personal needs such as driving a car, managing finances, and living safely at home. *Id.* Dr. Sadehh also recommended that Jackson be placed in the custody, care, or treatment in an appropriate facility and suggested placement in the Meridian Services Gero-Psychiatric Unit for no more than ninety-days. The medical team was concerned that if Jackson returned home, she would not take her medication or let home health workers into her house. On April 17, 2015, the court granted the hospital's application, and Jackson was placed under a temporary ninety-day commitment.

After Jackson was committed, Meridian Services contacted APS to assist placing Jackson in a nursing facility. Appellant's App. p. 6. On April 27, 2015, Steve Sumner ("Sumner") of APS filed a verified petition for emergency services. That same day, a hearing was held, and the trial court entered an order for emergency services, directing Jackson to be transported to The Woodlands Care Center ("The Woodlands"). The trial court scheduled a hearing on the petition for emergency services and to appoint a guardian ad litem and fiduciary conservator for May 8, 2015. After Jackson requested a continuance, a hearing was held on these matters on June 26, 2015.

[9] After arriving at The Woodlands, Jackson was under the care of Doctor Lynn Valena ("Dr. Valena"). Dr. Valena observed that Jackson was forgetful and needed help taking her medication. Dr. Valena believed that Jackson would benefit from receiving twenty-four-hour care. She also noted that Jackson was in relatively good physical shape. A social worker at The Woodlands, Katie Lucas ("Lucas"), also agreed that Jackson had cognitive issues, making her a good candidate for services. Lucas specifically explained that Jackson is unable to identify the day of the week, so she does not know when to go to work, pay bills, or take out the trash. Certified nursing aide at The Woodlands, Athena Jackson,[2] would sometimes remind Jackson where her room and bathroom were located and worried that if Jackson was sent home that she could not completely take care of herself. However, Jackson brushes her teeth, bathes, feeds, and dresses herself without any assistance from the nursing staff.

[10] Jackson has no immediate family, but Jackson's former sister-in-law, Lillian Pullins ("Pullins"), used to bring Jackson milk every so often. Pullins agreed that Jackson would not likely take her medication on her own but said that Jackson has done "good" over the years. Statement of Evidence p. 7.[3] Pullins explained that when Jackson lived on her own she purchased her own

---

[2] Athena Jackson is not in any way related to Norma Jackson.

[3] Because a large portion of the transcript was "indiscernible" due to the tape recorder not containing an external microphone, Jackson filed a motion to certify statement of evidence on November 23, 2015. With no objections from APS, the trial court granted the motion the next day.

groceries, paid off the mortgage on her house, and arranged for bills to be paid by her bank.

[11] The trial court entered a protective services order on June 30, 2015, finding Jackson to be an endangered adult in need of protective services for twenty-four-hour care and supervision. The court ordered Jackson to remain at The Woodlands until a medical doctor determines that she is ready for discharge into a less restrictive environment. Jackson now appeals.

**Jackson's Commitment**

[12] Although Jackson appeals the trial court's protective services order determining that she was an endangered adult involved in a life threatening emergency, we begin our analysis with Jackson's temporary commitment.

> Civil commitment is a significant deprivation of liberty that requires due process protections. Because everyone exhibits some abnormal conduct at one time or another, loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. The petitioner. . . is required to prove by clear and convincing evidence that the individual is: (1) mentally ill and (2) *either* dangerous *or* gravely disabled and that (3) commitment is appropriate. Ind. Code § 12-26-2-5(e). In order to carry its burden of proof, the petitioner is not required to prove that the individual is *both* dangerous *and* gravely disabled. However, there is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom.

*Civil Commitment of W.S. v. Eskenazi Health, Midtown Cmty. Mental Health Ctr.*, 23 N.E.3d 29, 33 (Ind. Ct. App. 2014) (quoting *M.L. v. Meridian*

*Servs., Inc.*, 956 N.E.2d 752, 755 (Ind. Ct. App. 2011) (quotation marks and some citations omitted), *trans. denied*.

[13] Although we have not reviewed the transcript of the commitment hearing, the emergency detention application and physician's statement was included in the record to support APS's argument. *See* Appellee's App. pp. 3, 6. In its application for emergency detention, Meridian Services alleged that Jackson needed to be committed because she was mentally ill and gravely disabled. *Id*. A mental illness is defined as a psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function. Ind. Code § 12-7-2-130. Dr. Sadehh indicated that Jackson was mentally ill and diagnosed her with dementia NOS, most likely the Alzheimer's type. Further, Dr. Saddeh expressed that Jackson was gravely disabled as defined in Indiana Code section 12-7-2-96:

> "Gravely disabled", for purposes of IC 12-26, means a condition in which an individual, as a result of mental illness is in danger of coming to harm because the individual:
>
> ***
>
> > (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

[14] Dr. Saddeh believed that Jackson was gravely disabled under Indiana Code section 12-7-2-96(2) because Jackson has "poor short-term memory, poor

insight and impaired judgment, and is unable to manage some personal needs such as driving a car, managing finances, and living safely at home." *See* Appellee's App. p. 6. Again, we have not been presented with the transcript from the commitment hearing, but we must emphasize that there is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom. *See Civil Commitment of W.S*, 23 N.E.3d at 33.

[15] After examining the evidence presented at the hearing on emergency services, we note that although Jackson undoubtedly suffers from cognitive impairment due to dementia, she is not dangerous and has been able to function safely. Before she was admitted to the Gero-Psychiatric Unit at Meridian Services, Jackson purchased her own groceries, cooked meals, bathed and dressed herself, brushed her teeth, took out the trash, and arranged for the bank to pay her bills. This same evidence might not have been presented at the commitment hearing, but because Jackson's temporary commitment essentially was converted into an involuntary protective order, it is crucial to question whether Jackson's underlying temporary commitment to the Gero-Psychiatric Unit was proper.

### Jackson's "Emergency" Protective Order

[16] After Jackson was committed, Meridian Services contacted APS because they believed that Jackson needed nursing home services, which Meridian Services does not provide. To maneuver around the temporary commitment and provide Jackson with more extensive supervision and care, APS filed a verified petition

for emergency services on April 27, 2015, which the trial court granted the same day. The order for emergency services directed Jackson to be transported to The Woodlands. Given that Meridian Services referred Jackson to APS, the petition for emergency services relied on similar grounds as the emergency detention application.

[17] Indiana Code section 12-10-3-28 outlines the process for obtaining an emergency protective order:

> (a) If:
>
>> (1) an alleged endangered adult does not or is unable to consent to the receipt of protective services arranged by the division or the adult protective services unit or withdraws consent previously given; *and*
>>
>> (2) the endangered adult is involved in a life threatening emergency;
>
> the adult protective services unit, either directly or through the prosecuting attorney's office of the county in which the alleged endangered adult resides, may petition the superior or circuit court in the county where the alleged endangered adult resides for an emergency protective order.

(Emphasis added).

[18] The emergency protective order must stipulate: (1) the objectives of the emergency protective order, (2) the least restrictive emergency protective services necessary to attain the objectives of the emergency protective order that

the endangered adult must receive, and (3) the duration during which the endangered adult must receive the emergency protective services. Ind. Code § 12-10-3-28(d)(1)-(3). Specifically, under subsection (f):

> An emergency protective order issued under this section may not remain in effect for longer than:
>
> > (1) ten (10) days; or
>
> > (2) thirty (30) days if the adult protective services unit shows the court that an extraordinary need exists that requires the order to remain in effect for not more than thirty (30) days.

Further, subsection (g) provides:

> If at the expiration of an order the adult protective services unit determines that the endangered adult is in need of further protective services and the endangered adult does not consent to the receipt of the services, a petition may be filed under section 21 of this chapter.

[19] In its emergency services order issued on April 27, 2015, the trial court stipulated the objectives of the emergency protective order and the least restrictive emergency protective services necessary to attain the objectives of the order. However, regarding duration the order reads:

> Norma Jackson upon discharge from the Gero-Psychiatric Unit of Meridian Services [], shall be transported to The Woodlands Care Center [], where she can continue to receive 24 hour medical and day to day care, until such time when she can be released by the Court under a Court Order with a letter from her

medical doctor stating she is able and ready for discharge into a lesser restrictive environment.

Appellant's App. p. 10.

[20] The language in the court's order is at issue because the duration of the emergency services is indefinite. An emergency protection order may not remain in effect for more than ten days, or at most thirty days if APS can show that an extraordinary need for services exists. *See* Ind. Code § 12-10-3-28(f). The purpose of emergency services is to remedy a life-threatening emergency. Jackson exhibited signs of dementia, which alone is not a life-threatening emergency.[4] In effect, the trial court entered an involuntary protective services order that is outlined in Indiana Code section 12-10-3-21. Under Indiana Code section 12-10-3-28(g), after an emergency services protective order expires, APS is required to file a petition under section 21 if it believes that the endangered adult is in further need of protective services. APS only filed a verified petition for emergency services here, but nevertheless, the court treated it like an involuntary protective services petition.

[21] Furthermore, a hearing was held on June 26, 2015, on the emergency services petition. The trial court issued a protective services order on June 30, 2015,

---

[4] We will address whether Jackson was involved in a life-threatening emergency in the sufficiency of the evidence section.

which included the same language as the April 27, 2015 emergency services order:

> It is considered, ordered, adjudged, and decreed by the Court that [Jackson] remain in the care of The Woodlands Care Center [], until such time when she can be released by the Court under a Court Order with a letter from her medical doctor stating she is able and ready for discharge into a lesser restrictive environment.

Appellant's App. p. 15. The emergency services order required that Jackson remain at The Woodlands for seventy-four days before the protective services order was issued. The protective services extended Jackson's placement at The Woodlands until a doctor approves her release. In reality, this means that Jackson could remain at the Woodlands for the remainder of her life.

[22] This procedure caused Jackson to be detained against her will for over seventy days, when Indiana Code section 12-10-3-28(f) explicitly limits the duration of an emergency services protective order to thirty days, at most. Accordingly, the trial court erred by not stating a duration of thirty days or less in its emergency services order. APS then failed to file a petition under Indiana Code section 12-10-3-21 when they believed that Jackson was in need of continued protective services. As such, the trial court's underlying protective services order is unauthorized by statute. After considering this well-meant but erroneous procedure, we now consider Jackson's argument.

[23] Jackson argues that APS failed to prove by clear and convincing evidence that she was an "endangered adult" and that a life-threatening emergency existed under Indiana Code section 12-10-3-28. Specifically, Jackson asserts that she has been involuntarily detained and deprived of her liberty and property.

[24] In reviewing the sufficiency of the evidence supporting a determination requiring clear and convincing evidence, we will consider only the evidence most favorable to the judgment and all reasonable inferences drawn therefrom. *T.D. v. Eskenazi Health Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015) (citing *Commitment of L.W. v. Midtown Cmty. Health Ctr.*, 823 N.E.2d 702, 703 (Ind. Ct. App. 2005)). To be "clear and convincing," the existence of a fact must be probable. *Id.* (citing *Lazarus Dep't Store v. Sutherlin*, 544 N.E.2d 513, 527 (Ind. Ct. App. 1989)), *reh'g denied, trans. denied.* We will not reweigh the evidence or judge the credibility of witnesses. *Id.* (citing *Civil Commitment of T.K. v. Dept. of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015)).

### A. Endangered Adult

[25] Under Indiana Code section 12-10-3-28, for a trial court to enter an order for emergency protective services, clear and convincing evidence must exists that an individual is (1) an endangered adult, (2) a life threatening emergency exists, and (3) the endangered adult is in need of the proposed emergency services. Indiana code section 12-10-3-2(a) defines an "endangered adult" as:

An individual who is:

> (1) at least eighteen (18) years of age;

> (2) incapable by reason of mental illness, intellectual disability, dementia, habitual drunkenness, excessive use of drugs, or other physical or mental incapacity of managing or directing the management of the individual's property or providing or directing the provision of self-care; and

> (3) harmed or threatened with harm as a result of:

>> (A) neglect;

>> (B) battery; or

>> (C) exploitation of the individual's personal services or property.

[26] In its petition for emergency services, APS included as an exhibit the physician's report that accompanied Meridian Services' application for emergency detention, which indicated that Jackson was diagnosed with dementia NOS. *See* Appellee's App. p. 6. At the hearing, APS presented evidence from Dr. Valena that Jackson scored a six out of ten on a mental status examination after arriving at The Woodlands. She also testified that Jackson is very forgetful and her short-term memory is compromised. APS also called a certified nursing aide who testified that sometimes Jackson has trouble

finding her room and bathroom at The Woodlands but does a great job taking care of herself.

[27] After reviewing the evidence in the record, the trial court determined that Jackson was an "endangered adult." Based on the evidence and circumstances, the finding that Jackson has dementia, which inhibits her ability to manage her property and self-care, is certainly probable. Therefore, we respect the trial court's discretion and will not reweigh the evidence. However, in a society where more and more elder adults suffer from dementia, a life-threatening emergency is needed to justify restraint of such an elder adult's liberty.

### B. Life Threatening Emergency

[28] "Life Threatening Emergency" is defined by Indiana Code section 12-10-3-4 as:

> a situation in which: (1) a severe threat to life or health of an endangered adult exists; (2) immediate care or treatment is required to alleviate that threat; and (3) the endangered adult is unable to provide or obtain the necessary care or treatment.

[29] We must first determine whether APS established that Jackson was in a situation with a severe threat to her life or health. Jackson was admitted to the Gero-Psychiatric Unit of Meridian Services after a series of events where she hit a small pine tree near her home, could not remember the location of her car, and called the police over twenty times attempting to locate the vehicle. Jackson was not injured in this accident, but the police determined that Jackson

would benefit from a psychological evaluation after conducting a welfare check at her home.

[30] Until the car accident occurred, and arguably after, Jackson was self-sufficient despite the forgetfulness caused by her dementia. Jackson purchased groceries, cooked meals, took out the trash, authorized the bank to pay her bills, and practiced good personal hygiene. Based on these facts and circumstances, we cannot conclude that Jackson's dementia at this stage and by itself, constitutes a severe threat to her life or health.

[31] Even if Jackson's dementia allegedly caused a severe threat to her life or health, the evidence indicates that *immediate* care or treatment was not required to alleviate the threat. Dr. Valena testified at the hearing that Jackson's treatment includes taking Zyprexa and Depakote. She also stated that Jackson needs assistance taking her medication, that she needs twenty-four-hour care, and that she "may not be safe." Statement of Evidence p. 6.

[32] Jackson was not treated for any injuries related to the underlying auto accident. Rather, she was admitted to the Gero-Psychiatric Unit several days after the accident. While taking medication for memory issues may assist Jackson to function more coherently, it is not *immediate* treatment that alleviates a *severe* threat to her life or health.

[33] Indiana Code section 12-10-3-28 seeks to provide *emergency* protective services to an endangered adult for a limited period of time. Here, Jackson may arguably be an endangered adult, but the treatment that Dr. Valena

recommended is long-term nursing home care, not immediate, emergency care. If APS believed that Jackson was in further need of care and treatment after the emergency protective services order expired, then it should have filed a petition under Indiana Code section 12-10-3-21. However, APS only filed a petition for emergency services.

[34] Lastly, we assess whether Jackson is unable to provide or obtain the necessary care or treatment for herself. Before she was admitted to the hospital, Jackson was self-sufficient. She lived alone in her home, with no immediate family nearby, but as previously mentioned could and did care for herself, or requested help from others when she needed it.

[35] Social worker Lucas testified that Jackson never knows the day of the week and needs to know the date so she can work, pay bills, and take out the trash. However, Lucas also conceded that Jackson did not work, had the bank pay her bills, and had no issues with trash accumulating in her home, so knowledge of the day of the week is not important to her health. Based on the record, it appears that the medical team at The Woodlands is most concerned that Jackson will not take her medication if she returns home.

[36] Jackson testified at the hearing that she would take medicine if she needed it but does not like to take "a bunch of drugs." Tr. p. 29. It is also worth noting that APS did not present any evidence at the hearing to show that Jackson's memory or cognition has improved or is functioning at a higher level because she is taking these medications. For all of these reasons, we cannot conclude

that APS proved by clear and convincing evidence that Jackson's dementia constituted a life-threatening emergency.

## Conclusion

[37] The trial court erred when it failed to stipulate a duration of thirty days or less for Jackson's emergency services order under the authorizing statute. Notwithstanding this error, APS established by clear and convincing evidence that Jackson was an "endangered adult." However, APS did not present sufficient evidence that Jackson was involved in a life-threatening emergency under Indiana Code section 12-10-3-28. We therefore reverse the trial court's order and remand with instructions that the trial court release Jackson from The Woodlands and allow her to return to her home.

[38] Reversed and remanded for proceedings consistent with this opinion.

Kirsch, J., and Brown, J., concur.