

**FILED**

Jul 20 2015, 10:50 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Deborah Markisohn | Rene Wyatt-Foston |
| Indianapolis, Indiana | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Civil Commitment of T.D., | July 20, 2015 |
| *Appellant-Respondent,* | Court of Appeals Case No. 49A05-1411-MH-529 |
| v. | Appeal from the Marion Superior Court |
| Eskenazi Health Midtown Community Mental Health Center, | Lower Court Cause No. 49D08-1308-MH-16567 |
| *Appellee-Petitioner.* | The Honorable Mark Batties, Commissioner |

**Pyle, Judge.**

## Statement of the Case

[1] Appellant-Respondent, T.D., appeals the trial court's order granting Appellee-Petitioner, Eskenazi Health Midtown Community Mental Health Center's ("the Hospital"), application for the emergency detention and involuntary civil commitment of T.D. based on her mental illness. She argues that the trial court

erred in ordering her regular commitment because there was insufficient evidence that she was "gravely disabled," as the Hospital was required by statute to prove. The only evidence in the record supporting her commitment was one isolated incident of unusual behavior, the fact that T.D. lived in a hotel, her psychiatrist's recommendation, and her refusal to seek treatment. Because this did not constitute clear and convincing evidence to support her involuntary commitment, we reverse the trial court's decision and remand for the trial court to vacate the commitment.

We reverse and remand.

## Issue

Whether the trial court erred when it ordered T.D.'s regular commitment.[1]

## Facts

T.D. is a fifty-one year old woman who has been diagnosed with bipolar disorder and has a history of psychiatric illness and treatment. Beginning on July 31, 2013, she was on a regular commitment with the Hospital. She was

---

[1] In *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 n.1 (Ind. 2015), our Supreme Court explained:

> In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. Involuntary civil commitment may occur under four circumstances if certain statutorily regulated conditions are satisfied: (1) "Immediate Detention" by law enforcement for up to 24 hours; (2) "Emergency Detention" for up to 72 hours; (3) "Temporary Commitment" for up to 90 days; and (4) "Regular Commitment" for an indefinite period of time that may exceed 90 days.

(Internal citations omitted).

doing well in treatment and resided at First Home, one of the Hospital's residential housing programs. However, on July 22, 2014, the Hospital filed a notice with the trial court seeking to terminate T.D.'s civil commitment because she had elected to receive voluntary treatment. On September 4, 2014, the trial court entered an order terminating T.D.'s commitment.

[3] When T.D.'s commitment ended, she was no longer able to live in the First Home residential program and went to live in a shelter and then in a hotel. During this time, T.D. became inconsistent in taking her medication and, according to her treating physician at the Hospital, Dr. Michael DeMotte ("Dr. DeMotte"), "her symptoms [] continued to worsen." (Tr. 8). One night at the hotel, she was preparing a presentation for a large event in town, and she flooded her hotel room with water and steam, intending to set off the fire alarms so that the fire department would come to the hotel and help her prepare for the event.

[4] Based on this incident, the Hospital filed an application for emergency detention of T.D. on October 14, 2014. Dr. DeMotte filed a report on the application on October 16, 2014, and recommended that T.D. be placed on a regular commitment under INDIANA CODE § 12-26-7 because she was in need of "custody, care, or treatment in an appropriate facility." (Tr. 52). He also reported that T.D. had refused to continue voluntary treatment. The next day, the trial court set an evidentiary hearing on the matter for October 20, 2014, and ordered that T.D. be detained pending the hearing.

Dr. DeMotte testified at the hearing as a psychiatric expert. He stated that T.D. was a "very pleasant woman" and that he did not believe she was a danger to herself or others. (Tr. 9). However, he also testified that:

> [she] does experience symptoms consistent with mania, including a euphoric mood. She gets very excited with things; very grandiose in her plans, large scope projects outside of a scope of reality. [She] [i]s very distractible in this and her thought process and decision[-]making frequently kind of get[s] side-tracked from what she's working on—rapid speech, racing thoughts, some impulsivity. All kind of symptoms together in combination consistent with a manic episode.

(Tr. 10). He explained that while medication did not cure all of T.D.'s symptoms, she had been doing substantially better while on treatment and her ability to function had improved. He expressed concerns that since her previous commitment had been terminated "there ha[d] been more inconsistency with medications[.]" (Tr. 8). He said that the last time he had talked to T.D., she had told him that "she no longer wished for voluntary treatment." (Tr. 11). Instead, "[s]he felt like she was ready to be discharged from the hospital and was no longer going to be taking medications unless there was a subsequent court order for it." (Tr. 11).

Later in his testimony, Dr. DeMotte also expressed concerns that T.D. had not "been able to maintain housing" without treatment, whereas she had been able to maintain it while she was in treatment. (Tr. 11). He said that he thought her symptoms "impair[ed] her judgment" and reasoning such that "[w]e get into circumstances such as those when she was brought to the hospital [from] the

hotel." (Tr. 11). Based on these concerns, he recommended a regular commitment and said that he believed a regular commitment transitioning to outpatient care was the least restrictive option for T.D.

[7] At the conclusion of the hearing, the trial court found that T.D. was "gravely disabled," as required by statute, and granted the petition for her regular commitment. The court also ordered that T.D. take all medications as prescribed, attend all clinic sessions as scheduled, and maintain her address and phone number with the court. T.D. now appeals.

## Decision

[8] On appeal, T.D. argues that the trial court erred in ordering her commitment because there was not sufficient evidence to prove that she was "gravely disabled" as required by statute. *See* IND. CODE § 12-7-2-96. We have previously noted that civil commitment is a significant deprivation of liberty that requires due process protections. *Commitment of L.W. v. Midtown Cmty. Health Ctr.*, 823 N.E.2d 702, 703 (Ind. Ct. App. 2005). The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom and, given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *Civil Commitment of T.K.*, 27 N.E.3d at 273.

[9] To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by clear and convincing evidence. *In re*

*Commitment of G.M.*, 743 N.E.2d 1148, 1151 (Ind. Ct. App. 2001). Clear and convincing evidence is that which "'not only communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment, but . . . also has the function of reducing the chance of inappropriate commitments.'" *Civil Commitment of T.K.*, 27 N.E.3d at 273 (quoting *Commitment of J.B. v. Midtown Mental Health Ctr.*, 581 N.E.2d 448, 450 (Ind. Ct. App. 1991)). It is defined as an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *Lazarus Dep't Store v. Sutherlin*, 544 N.E.2d 513, 527 (Ind. Ct. App. 1989), *reh'g denied*, *trans. denied.* In order to be clear and convincing, the existence of a fact must be highly probable. *Id.*

[10] In reviewing the sufficiency of the evidence supporting a determination requiring clear and convincing evidence, we will consider only the evidence favorable to the judgment and all reasonable inferences drawn therefrom. *Commitment of L.W.*, 823 N.E.2d at 703. We will not reweigh the evidence or judge the credibility of witnesses. *Civil Commitment of T.K.*, 27 N.E.3d at 273.

[11] In order for a trial court to order a regular commitment, there must be clear and convincing evidence that an individual is: (1) mentally ill; and (2) either dangerous or gravely disabled. I.C. § 12-26-7-1. Under INDIANA CODE § 12-7-2-96, "gravely disabled" is defined as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

> (1) is unable to provide for that individual's food, clothing, shelter, or other essential needs; or
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Because this statute is written in the disjunctive, a trial court's finding of grave disability survives if we find that there was sufficient evidence to prove either that the individual was unable to provide for her basic needs or that her judgment, reasoning, or behavior was so impaired or deteriorated that it resulted in her inability to function independently. *Civil Commitment of W.S. v. Eskenazi Health, Midtown Cmty. Health*, 23 N.E.3d 29, 34 (Ind. Ct. App. 2014), *trans. denied.*

[12] T.D. disputes the trial court's finding that she was "gravely disabled" such that she required a regular commitment. Specifically, she asserts that, even though she suffers from bipolar disorder, the Hospital did not prove, by clear and convincing evidence, that she was unable to provide for her basic needs or that her judgment and reasoning were impaired. She notes that there was no evidence that she lacked personal grooming, was unable to obtain clothing and dress appropriately, or was malnourished. She also compares her case to *K.F. v. St. Vincent Hosp. & Health Care Ctr.*, 909 N.E.2d 1063, 1067 (Ind. Ct. App. 2009), where we reversed a regular commitment based on insufficient evidence.

[13] In response, the Hospital argues that there was sufficient evidence to prove that T.D. was gravely disabled under both prongs of the definition. First, the

Hospital asserts that, even though T.D. had housing, she had not been able to maintain it. Second, the Hospital argues that the hotel incident that led to T.D.'s emergency detention, as well as Dr. DeMotte's testimony explaining his opinions regarding T.D.'s need for treatment, were sufficient to prove that she was gravely disabled. We disagree.

[14] In *Commitment of G.M.* and *Commitment of J.B.*, we recently discussed our Supreme Court's seminal opinion regarding commitment in *Addington v. Texas*, 441 U.S. 418 (1979). We explained:

> In [*Addington*] the United States Supreme Court expressed a strong concern that a decision ordering an involuntary commitment might be made on the basis of a few isolated instances of unusual conduct which occurred within a range of conduct which is generally acceptable. The Court opined that since everyone exhibits some abnormal conduct at one time or another, "loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior."

*Commitment of G.M.*, 743 N.E.2d at 1151 (quoting *Commitment of J.B.*, 581 N.E.2d at 450) (discussing *Addington*).

[15] Our Indiana Supreme Court recently echoed the *Addington* Court's caution against unnecessary commitments in *Civil Commitment of T.K.* There, our supreme court disapproved of multiple Court of Appeals decisions affirming commitments and emphasized that there must be a higher standard of clear and convincing evidence to support a regular commitment. *Civil Commitment of T.K.*, 27 N.E.3d at 274. The Court noted that "[t]he clear and convincing

standard is employed in cases 'where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals.'" *Id.* at 276 (quoting *In re G.Y.*, 904 N.E.2d 1257, 1260 n.1 (Ind. 2009) (additional citation omitted)).

[16] Based on this standard, the Court found that there was insufficient evidence to support T.K.'s regular commitment, even though he had put flyers on people's windshields to inform them of a person's criminal record, had gone into an Adult and Child Clinic and started to scream at the staff in a manner that made them concerned, had acted aggressively towards other patients, was estranged from all family support, had mentioned use of violence in e-mails and on Facebook, and had refused treatment. *Id.* at 274. The supreme court reasoned that no evidence had been presented to dispute T.K.'s ability to provide food, clothing or shelter to himself. *Id.* at 276. Also, there was no evidence that he was gravely disabled because a refusal to medicate, alone, could not support a finding of gravely disabled. *Id.* As for T.K.'s aggression, T.K. "made no physical outbursts, destroyed no property, [and] did not put himself or others in actual danger with idiosyncratic behavior[.]" *Id.* at 277. Notably, the Court did not find testimony from T.K.'s psychiatrist that T.K. was gravely disabled dispositive. *See id.* at 275.

[17] In light of *Addington* and *T.K.*, we conclude that, here, there was not sufficient evidence to support T.D.'s regular commitment. While the Hospital argues that T.D. was unable to maintain shelter, there was no evidence in the record

that she was unable to pay her hotel bills. We find that T.D.'s decision to live in a hotel, alone, cannot support a finding of a grave disability because it is indisputable that a hotel is a form of "shelter."

[18] As for the second prong of the definition of gravely disabled—concerning a substantial impairment in judgment, reasoning, or behavior—the primary evidence in the record regarding this prong was Dr. DeMotte's testimony that he believed T.D.'s judgment was impaired when she was not in treatment. However, the Indiana Code defines "gravely disabled" as:

> a condition in which an individual, as a result of mental illness, is *in danger of coming to harm* because the individual:
>
> \* \* \*
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. § 12-7-2-96 (emphasis added). Thus, a part of the definition is that, in addition to having impaired, the individual "is in danger of coming to harm" as a result of the impaired judgment. I.C. § 12-7-2-96. Dr. DeMotte testified that T.D. was a "very pleasant woman" and that he did not believe she was a danger to herself or others. (Tr. 9).

[19] Further, it is apparent that Dr. DeMotte's opinion that T.D. was gravely disabled was based on her alleged failure to maintain housing, her refusal to seek treatment even though her behavior improved with treatment, and her incident at the hotel. We have already noted that T.D.'s housing at the hotel

was not a sufficient basis for a commitment, and in *T.K.* our supreme court affirmed that refusal to seek treatment, alone, is not a sufficient basis for commitment. *See id.* at 276. As for T.D.'s incident at the hotel, we find that, while this behavior might have indicated a need for treatment, it was not a sufficient basis for an ongoing, regular commitment. In *Addington*, our Supreme Court warned against the danger of committing individuals based on "a few isolated instances of unusual conduct." *Addington*, 441 U.S. at 427. The hotel incident was one isolated incident, and, while T.D.'s actions at the hotel were unusual, she did not harm herself or anyone else.

[20] Because the only evidence the Hospital presented at trial did not constitute clear and convincing evidence to support T.D.'s commitment, we reverse the trial court's decision and remand for the trial court to vacate the regular commitment.

Reversed and remanded.

Crone, J., and Brown, J., concur.