## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 18 2018, 9:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Flora
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Civil Commitment of:<br><br>M.H.,<br><br>*Appellant*,<br><br>     v.<br><br>Kristen Ludwig and State of Indiana,<br><br>*Appellees*. | December 18, 2018<br><br>Court of Appeals Case No. 18A-MH-1580<br><br>Appeal from the Allen Superior Court<br><br>The Honorable David J. Avery, Judge<br><br>Trial Court Cause No. 02D09-1805-MH-537 |

**Brown, Judge.**

[1] M.H. appeals the trial court's June 6, 2018 Order of Temporary Commitment of M.H. We affirm.

## Facts and Procedural History

[2] On May 30, 2018, Kristen Ludwig, a therapist at St. Joseph Hospital in Fort Wayne, Indiana, filed a petition for involuntary commitment related to M.H. On June 6, 2018, the trial court held a hearing at which it heard testimony from Dr. Smitha Patibandla, M.H., M.H.'s father, and Ludwig. Dr. Patibandla testified that she accepted M.H. for an inpatient stay on May 24, 2018, and that M.H. had been brought to the emergency room by her mother and had physical complaints. Dr. Patibandla testified the emergency room doctors did not find anything physically wrong with her but were concerned because M.H. was "talking about having a microchip inside of her neck," they asked for a psychiatric consultation, and M.H. was admitted because Dr. Patibandla thought she was paranoid and having delusions. Transcript Volume II at 3. Dr. Patibandla testified that Adderall pills were found on M.H., M.H. indicated she had an old prescription, and "[s]o, we gave [M.H.] a diagnosis of unspecified psychosis and a substance induced (inaudible) at that time." *Id*. at 4.

[3] When asked to provide specific facts upon which she based her observation that M.H. was paranoid, Dr. Patibandla testified:

> She was talking about this microchip in her neck and I think she was discussing this with family members and she was asking her sister to check and see if in fact she did have a microchip in her

neck. So, I talked with her and said how is it possible that she could have a microchip in her neck and why would somebody do that to her? Um, she was trying under a strong belief that there was a microchip in her neck and she was stating that this was likely to related to um, a treatment for her depression and anxiety problems. I even asked her, who would put a chip in your neck and why would they do it? So, she said it could be a doctor and she doesn't know who put it. I even asked her; do you think it's possible that somebody could put a chip in your neck without your consent or without your knowledge? And, she thinks yes it is possible. So, these are some of the things that I was really concerned about.

*Id*. at 4-5. Dr. Patibandla further testified that M.H. "has been making extensive notes, she has been writing down things, and she has made several attempts to elope from the unit both on Sunday and Monday" and that a drug screen was eventually performed which was positive for amphetamine. *Id*. at 5. She testified that M.H. had been previously diagnosed with depression, anxiety, post-traumatic stress disorder, and ADHD and had been seeing a psychiatrist. She testified "[w]e gave her a diagnosis of unspecified psychosis. Um, substance abuse psychosis and amphetamine induced." *Id*. at 7. When asked if M.H. was at substantial risk that she will harm herself or others, Dr. Patibandla testified "she will likely come to harm because of her symptoms. I would not say directly through herself or others but she is also responsible for three young children. I don't think she is at risk of directly killing herself or killing others at this time." *Id*. at 8. When asked if M.H. was in danger of coming to harm because of an inability to provide for her food, clothing, shelter, or other essential human needs, Dr. Patibandla testified: "I will say yes. If she refuses

medications and if she continues to abuse drugs." *Id*. at 9. When asked whether M.H. had a substantial impairment or obvious deterioration of her judgment, reasoning, or behavior that affected her ability to function independently, Dr. Patibandla testified: "It would significantly affect her reasoning and judgment." *Id*. She indicated that M.H. was dressed appropriately, eating, and functioning fine but that she was concerned for the three children as M.H. had a full-time job and stated she was using Adderall because it gave her more energy. When asked what essential need M.H. would not be able to provide for herself, Dr. Patibandla testified "I would say safety of herself and her kids." *Id*. at 10.

[4]     M.H. testified that she was employed and attended evening courses. She indicated that she did not believe she had a microchip in her neck. When asked "where that is coming from," M.H. testified "[m]y sister told my mother and my mother told the doctors in the E.R. that she was worried that I would cut myself because of that statement." *Id*. at 13. She indicated she had never said she had a microchip in her neck, and that she was diagnosed with PTSD by a counselor in 2009 or 2010 and with ADHD in February 2017. She stated she saw a therapist once a week since December 2017, was taking the medication she was given, and would continue to do so if released. She indicated she tested positive for amphetamines which was from the Adderall and did not have a current prescription for Adderall. When asked if it was accurate that she took Adderall because she was stressed, M.H. replied: "It is not completely accurate but not completely wrong. [M]y children's grandmother puts a lot of pressure

on me and I do feel that I have to be super mom from time to time when she is putting that pressure on me. And, since this hospital stay in two weeks, she has put in an order to get temporary custody of my children." *Id*. at 14-15. She indicated she was attending AA meetings twice a week, she provides food, clothing, and shelter for herself, and there is no area in which she is unable to function on her own. M.H. testified: "I have been doing everything in my power to get better. This feels more like a step back than helping." *Id*. at 16. She indicated she has never attempted to injure herself, and when asked if she knew why her sister concluded that she may try to cut out a microchip, M.H. answered: "Yes, I think I know why. I was having a hypothetical conversation with her just about many things and I can't have those conversations with my sister or my mother. They take it very literal and it's not meant to be taken literally." *Id*. at 19. M.H. indicated the Adderall was something she obtained outside of a doctor's office. When asked if she felt the Adderall helped her in keeping things together, M.H. answered: "More than keeping things together, but going above and beyond. I can keep things together on my own, it's the going above and beyond and being super mom; that's what I was struggling with, the pressures from the grandmother." *Id*. at 20.

[5] M.H.'s father testified that he saw her at least twice a week and spoke with her almost daily, he had never heard M.H. talk about microchips in her neck or voice any other concerns like delusional thoughts, she provided food, clothing, and shelter for herself and her children, the children are very well-behaved and taken care of, and he had no concerns about M.H.'s ability to care for herself or

her children. He testified that M.H.'s home was clean, there was food, and he had no concerns about the children remaining there.

[6] Dr. Patibandla testified again and indicated that she discussed the microchip with M.H. and testified: "I said who would put it? She said a doctor would put it. And why would a doctor put it? Because sometimes doctors do that to treat depression and anxiety symptoms. I said I have been a psychiatrist for such a long time and I have never done or seen anything like that. So, I have challenged her delusions and she continued to make those statements." *Id.* at 27-28. She also testified that M.H. "has talked to multiple staff on the unit, telling them about a microchip and she seems to kind of believe in that delusion very much." *Id.* at 28. When asked how long she anticipated that M.H. would remain in inpatient care, Dr. Patibandla stated "[s]he has a distress plan . . . so I could discharge her as early as within the next twenty-four hours" and "I just need to make sure that she has appointments and just need to confirm that she can follow-up on an outpatient basis and then I can discharge her within the next twenty-four hours." *Id.* at 29. Dr. Patibandla indicated she had seen improvement over the prior several days and attributed the improvement to clearing up the substance abuse psychosis, the structured environment and lack of stress, and the antipsychotic medication. She also testified that she had seen quite a few patients experience significant psychotic symptoms with Adderall use. Ludwig testified that she was the lead therapist on the adult unit at St. Joseph Hospital and that M.H. had stated to her and a nurse manager that she had a microchip in her neck.

[7]     M.H. testified again and, when asked "[y]ou say you have a microchip in your neck or a hypothetical conversation, I don't understand.  Can you explain that for us," answered: "Yes, I constantly have hypothetical conversations.  So, I was bringing that to their attention and I had said the word hypothetical at least twenty times each time I sat in that chair and there are video tapes, so I would say let's bring the evidence." *Id*. at 34.

[8]     The trial court stated:

> Alright.  [M.H.], out of an abundance of caution, I am going to go ahead and grant the temporary commitment with the understanding of what I am hearing that uh, you will be transitioned to an outpatient setting here very shortly.  I think the evidence that the fact that you came in and I am glad you came in voluntarily with your mother and as I understand that your testimony was that for whatever reason what was going on in your life at that point that you were having some concerns and obviously were taking some medications to help deal with that situation, I just want to make sure that as you make that transition out of the hospital setting um, and now that you have the Adderall out of your system and I believe from the testimony that you are thinking more clearly that I just want to make sure that that transition goes well for you.

*Id*. at 35-36.  M.H. asked when she would be going home for her children, and the court replied "I believe Dr. Patibandla felt that within twenty-four hours you would head home" and "I want to make sure that transition goes well and that as you make that transition if you feel you still need help that there is help readily available for you." *Id*. at 36.

The court issued an Order of Temporary Commitment dated June 6, 2018. The court's order found that M.H. is suffering from mental illness and that she is gravely disabled.[1] The court found she was in need of commitment for a temporary period not to exceed ninety days, found Park Center was an appropriate facility, and ordered the facility or attending physician to submit a treatment plan within fifteen days of M.H.'s admission.[2]

## *Discussion*

M.H. requests this Court to reverse her involuntary commitment and argues the trial court's decision is not supported by sufficient clear and convincing evidence of grave disability. In Indiana, an individual who is alleged to be mentally ill and either dangerous or gravely disabled may be committed to a facility for not more than ninety days under Ind. Code §§ 12-26-6.[3] Ind. Code § 12-26-6-1. The petitioner is required to prove by clear and convincing evidence

---

[1] The pre-printed sentence in the order that the respondent is dangerous to self or others is crossed out.

[2] Entries in the chronological case summary ("CCS") indicate that the court scheduled and then cancelled a status hearing for June 13, 2018. One of the entries indicating the hearing was cancelled states: "Reason: Other." Appellant's Appendix Volume 2 at 3.

[3] The Indiana Supreme Court has stated:

> In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. Involuntary civil commitment may occur under four circumstances if certain statutorily regulated conditions are satisfied: (1) "Immediate Detention" by law enforcement for up to 24 hours, *see* Ind. Code § 12-26-4 et seq.; (2) "Emergency Detention" for up to 72 hours, *see* Ind. Code § 12-26-5 et seq.; (3) "Temporary Commitment" for up to 90 days, *see* Ind. Code § 12-26-6 et seq.; and (4) "Regular Commitment" for an indefinite period of time that may exceed 90 days, *see* Ind. Code § 12-26-7 et seq.

*Civil Commitment of T.K. v. Dep't of Veterans Affairs,* 27 N.E.3d 271, 273 n.1 (Ind. 2015). Here, the court entered an order of temporary commitment.

that the individual is mentally ill and either dangerous or gravely disabled and detention or commitment of that individual is appropriate. Ind. Code § 12-26-2-5(e)[4]; *Civil Commitment of T.K.*, 27 N.E.3d at 273-276. The clear and convincing evidence standard is an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *See T.D. v. Eskenazi Health Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). In order to be clear and convincing, the existence of a fact must be highly probable. *Id.* In reviewing the sufficiency of the evidence supporting a determination requiring clear and convincing evidence, we will consider only the evidence favorable to the judgment and all reasonable inferences drawn therefrom, and we will not reweigh the evidence or judge the credibility of witnesses. *Id.*

[11] M.H. maintains that the evidence does not support the court's determination that she is "gravely disabled." Ind. Code § 12-7-2-96 provides:

> "Gravely disabled", for purposes of IC 12-26, means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> > (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
> >
> > (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or

---

[4] Ind. Code § 12-26-2-5 expressly provides that it applies under Ind. Code §§ 12-26-6.

behavior that results in the individual's inability to function independently.

[12] M.H. argues that no evidence was presented that she was unable to provide for her food, clothing, shelter, or other essential human needs or that she had a substantial impairment or deterioration of judgment that resulted in her inability to function independently. She argues she was employed and enrolled in college, her home was clean and there was food in the home, she was taking medications as prescribed and would do so after her release, she had weekly appointments with a therapist and attended Alcoholic Anonymous meetings twice per week, she dressed appropriately, and her children were well-cared for. M.H. further argues that, although Dr. Patibandla testified that she was in danger of coming to harm if she refused medications and continued to abuse drugs, Dr. Patibandla also testified that M.H. was taking her medications and asserts no evidence was presented that she would continue to abuse drugs. She also argues that, while Dr. Patibandla indicated that the essential need that she was not providing was the safety of herself and her children, there was no evidence presented that her or her children's safety was ever in jeopardy and the trial court did not find that she was dangerous. She also argues that nothing in the record indicates that she was unable to function independently.

[13] The record reveals that M.H. tested positive for amphetamines which was from the Adderall she had been using and that she did not have a current prescription for Adderall. M.H. presented to the hospital staff stating there was a microchip in her neck. Dr. Patibandla indicated that M.H. suffered from a substance

abuse psychosis that was amphetamine induced, that she would likely come to harm because of her symptoms, that she was in danger of coming to harm because of an inability to provide for her food, clothing, shelter, or other needs if she refuses medications and continues to abuse drugs, and as a result of her mental illness M.H. had a substantial impairment or obvious deterioration of her judgment and reasoning. The court heard the testimony of Dr. Patibandla and Ludwig regarding M.H.'s statements and behavior at the hospital, her diagnoses, and her use of Adderall. The court was able to observe M.H. and the witnesses and assess their demeanors and testimony.

[14] Based upon the record, we conclude that clear and convincing evidence supported the trial court's finding that M.H. was gravely disabled for purposes of her involuntary commitment.

## *Conclusion*

[15] For the foregoing reasons, we affirm the trial court's June 6, 2018 order.

[16] Affirmed.

Bailey, J., and Bradford, J., concur.