## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 29 2020, 10:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher Kunz
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Stephen E. Reynolds
Sean T. Dewey
Ice Miller, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Civil Commitment of M.T. | April 29, 2020 |
| *Appellant-Respondent,* | Court of Appeals Case No. 19A-MH-2330 |
| v. | Appeal from the Marion Superior Court |
| Options Behavioral Health Systems, | The Honorable Steven R. Eichholtz, Judge |
| *Appellee-Petitioner.* | The Honorable Melanie Kendrick, Magistrate |
| | Trial Court Cause No. 49D08-1908-MH-34159 |

**Pyle, Judge.**

# Statement of the Case

M.T. ("M.T.") appeals the trial court's order for his involuntary regular civil commitment.[1] M.T. argues that there was insufficient evidence to support his regular commitment because Options Behavioral Health Systems ("Options") did not prove by clear and convincing evidence that he was "gravely disabled," as defined by INDIANA CODE § 12-7-2-96. Concluding that there was sufficient evidence, we affirm

We affirm.

# Issue

> Whether there was sufficient evidence to support the trial court's order for M.T.'s involuntary regular civil commitment.

# Facts

In early August 2019, thirty-nine-year-old M.T. traveled from Indianapolis to Chicago. While in Chicago, M.T. spent his days at the library and his nights sleeping on the streets. Eventually, M.T. called his brother, V.L., and mother

---

[1] In *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 n.1 (Ind. 2015), the Indiana Supreme Court explained:

> In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. Involuntary civil commitment may occur under for circumstances if certain statutorily regulated conditions are satisfied: (1) "Immediate Detention" by law enforcement for up to 24 hours; "Emergency Detention" for up to 72 hours; (3) "Temporary Commitment" for up to 90 days; and (4) "Regular Commitment" for an indefinite period of time that may exceed 90 days.

(internal citations omitted).

and informed them where he was. V.L. and M.T.'s mother drove to Chicago to pick up M.T. As they drove back to Indianapolis, M.T. explained that "the voices" had told him to go to Chicago and to not take his medication. (Tr. 20). V.L. and M.T.'s mother encouraged M.T. to go to the hospital after his Chicago trip, but he refused.

[4] On August 15, 2019, M.T. was found walking in the middle of a busy street with his eyes closed, saying that he was a rapist and a murderer. The police took him to Community Hospital, and a Community Hospital physician filed an application for emergency detention. The next day, M.T. was transferred to Options. Options then filed a Report Following Emergency Detention. This report included a Physician's statement signed by Dr. Richard Payne ("Dr. Payne"), who stated that M.T. was suffering from Schizophrenia and Bipolar Disorder and was gravely disabled. The trial court ordered M.T. to be detained for an evidentiary hearing to be held on August 22.

[5] At the evidentiary hearing, Dr. Payne and V.L. testified. Dr. Payne testified that he was a psychiatrist with Options, and that M.T. had a diagnosis of Paranoid Schizophrenia. Dr. Payne testified that M.T. "presents [as] very paranoid. He talks to himself when others, you know, when there is no one there[,]" and that M.T. was "very guarded." (Tr. 7). Dr. Payne explained that upon his admission to Options, M.T. was expressing suicidal ideations. According to Dr. Payne, M.T. had refused to eat or drink water for several days, and his refusal was "severe" and stemmed from his mental illness. (Tr. 9). Dr. Payne testified that he was concerned about M.T. because of his

Paranoid Schizophrenia. Specifically, Dr. Payne explained that "[M.T.] believes that these things are so real[,]" and that he will take action to alleviate his paranoia. (Tr. 9). Further, that action may involve harming "the people who he feels may be after him or to end his own life." (Tr. 9-10).

[6] Dr. Payne further testified that M.T. had no insight into his mental illness. He explained that this lack of insight affected M.T.'s ability to seek care or take medication. Further, Dr. Payne stated that M.T. believed he did not need medication, and that this belief has led to multiple hospital admissions. According to Dr. Payne, M.T. had been hospitalized ten times since 2013. Dr. Payne believed that M.T. had been hospitalized five times in 2019, and that, prior to being hospitalized in August 2019, M.T.'s most recent hospitalization was in February 2019. As a result of the February hospitalization, M.T. was temporarily committed; it terminated in May 2019.

[7] When asked how M.T.'s Paranoid Schizophrenia impacts his judgment or ability to function independently, Dr. Payne explained that M.T. was unable to make simple decisions, did not currently have a job, and would not be able to hold a job because "he could not even respond to simple tasks that we were trying to get him to do." (Tr. 10). Dr. Payne stated that based on his treatment of M.T., he believed that M.T. was "[g]ravely disabled and severely disabled[]" and that "[t]his is someone [he] worr[ies] about extremely." (Tr. 11). When asked if M.T. presented a substantial risk of harming himself, Dr. Payne answered in the affirmative. Dr. Payne explained that a regular commitment was necessary because:

[M.T.] has all of these hospitalizations just this year and he has had over – about ten since two thousand and thirteen. You do not get too many chances with a schizophrenic. Usually, to get well in that time – usually something happens. You know, a lot of them end up dead or they get so frightened and paranoid they feel that they have to attack you or attack random people.

(Tr. 12). Dr. Payne testified that, if the regular commitment were granted, he planned to put M.T. on a long acting injectable medication. He further recommended that M.T. remain inpatient "for several months at first" and then be "transfer[red] to a state facility where he could be treated longer because he just had not gotten well." (Tr. 13-14). Dr. Payne indicated that with treatment, M.T.'s prognosis would be "[s]ubstantially better than it [was] now[,]" and without treatment, "his prognosis [was] very poor[.]" (Tr. 14).

[8] M.T.'s older brother, V.L., testified about M.T.'s trip to Chicago when he spent his days at the library and nights sleeping on the street. V.L. expressed concerns regarding whether M.T. could independently support himself. He explained that M.T. had previously lived in an apartment but had been evicted because he did not pay his rent. V.L. further explained that their mother had allowed M.T. to live with her, but that M.T. did not want to do so, preferring instead to stay at the Wheeler Mission or to sleep on the streets. When asked whether his brother had been taking his medication or had otherwise been compliant with his treatment, V.L. testified that M.T. had not. Later in V.L.'s testimony, he explained that in 2005, M.T. had claimed that voices had told M.T. to jump out of a three-story-window, which he acted on. Additionally, in 2016, M.T. claimed the voices told him to kill himself, leading M.T. to drive

into a highway median. V.L. stated that his brother's illness and suicidal behavior were "a vicious cycle." (Tr. 21).

[9] At the conclusion of the hearing, the trial court found that M.T. was "gravely disabled," and granted the petition for his regular commitment. As a basis for its decision, the court explained as follows:

> The court finds that the testimony and evidence today from the doctor as well as the brother and the fact that [M.T.] was on a previous commitment this year in February – it expired in May. And there ha[ve] been at least two if not three possible admissions since then. There have been five total admissions this year alone. Shows that would be the least restrictive alternative at this point is a regular commitment as a temporary commitment gave [M.T.] an opportunity to follow up with treatment on his own and he did not do so. The multiple admissions show that – or also show that he is – has a substantial impairment in his judgment that is leading to an obvious deterioration in his ability to function as well as care for himself. Testimony that he has not been eating in addition to again, the multiple admissions recently show that the respondent is gravely disabled. The court will grant a regular commitment at this point and find it is the least restrictive.

(Tr. 25). The court also ordered that M.T. take all medications as prescribed, attend all clinic sessions as scheduled, and maintain his address and phone number with the court. M.T. now appeals.

## Opinion

[10] On appeal, M.T. contends that there was insufficient evidence to support his involuntary regular commitment because Options did not prove by clear and convincing evidence that he was "gravely disabled." "'[T]he purpose of civil

commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is at stake.'" *T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015) (quoting *In re Commitment of Roberts*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000)). The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *Id.*

[11] To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by clear and convincing evidence. *In re Commitment of G.M.*, 743 N.E.2d 1148, 1151 (Ind. Ct. App. 2001). Clear and convincing evidence is defined as an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *T.D. v. Eskenazi Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). In order to be clear and convincing, the existence of a fact must be highly probable. *Id.* When we review the sufficiency of the evidence supporting an involuntary commitment, we will affirm if, "considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence." *T.K.*, 27 N.E.3d at 273. (quotation and citation omitted).

[12] To obtain an involuntary commitment, a petitioner is "required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either

dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." IND. CODE § 12-26-2-5(e) (format altered). Thus, here, Options had the burden of proving subsections (1) and (2) by clear and convincing evidence.

[13] M.T. does not dispute that he is mentally ill. Rather, he argues that there was insufficient evidence to support the trial court's conclusion that, as a result of his mental illness, he is gravely disabled. Gravely disabled is defined as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> > (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
> >
> > (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

IND. CODE § 12-7-2-96. Because this statute is written in the disjunctive, a trial court's finding of grave disability survives if we find that there was sufficient evidence to prove either that the individual was unable to provide for his basic needs or that his judgment, reasoning, or behavior is so impaired or deteriorated that it results in his inability to function independently. *Civil Commitment of W.S. v. Eskenazi Health, Midtown Cmty. Health*, 23 N.E.3d 29, 34 (Ind. Ct. App. 2014), *trans. denied*.

[14] M.T. asserts that the evidence does not show that he was "gravely disabled." Specifically, he argues that the court "stated two reasons for finding that M.T. was gravely disabled – he has had multiple hospital admissions and has not

been eating[]" and that neither one of these reasons supported a finding of grave disability. (M.T.'s Br. 9). In response, Options argues that there was sufficient evidence that M.T. was "gravely disabled." We agree with Options.

[15] The record reveals that there was evidence that M.T.'s judgment, reasoning, or behavior was so impaired or deteriorated that it results in his inability to function independently. Specifically, M.T. was found walking in the middle of a busy street with his eyes closed, saying that he was a rapist and a murderer. Dr. Payne testified that M.T. suffers from Paranoid Schizophrenia and that he was "very paranoid[]" and "guarded." (Tr. 7). The doctor explained that when M.T. arrived at Options, M.T. expressed suicidal ideations, and refused to eat or drink water for several days. Dr. Payne explained that M.T.'s refusal was "severe" and stemmed from his mental illness. (Tr. 9). When asked how M.T.'s Paranoid Schizophrenia impacts his judgment or ability to function independently, Dr. Payne explained that M.T. was unable to make simple decisions and would not be able to hold a job because he could not respond to simple tasks.

[16] Additionally, there was evidence that M.T. was unable to provide for his basic needs. Dr. Payne indicated that M.T. had no insight into his mental illness, and that this lack of insight affected M.T.'s ability to seek care or take medication because he did not believe he needed medication. Furthermore, V.L. explained that he did not believe that M.T. could independently support himself because M.T. previously had lived in an apartment but had been evicted because he did not pay his rent. V.L. further explained that their mother

allowed M.T. to live with her, but that M.T. did not want to do so, preferring to stay at the Wheeler Mission or to sleep on the streets.

[17] Based upon the record, we conclude that clear and convincing evidence supports the trial court's determination that M.T. was gravely disabled for purposes of his involuntary regular commitment. *See*, *e.g.*, *Golub v. Giles*, 814 N.E.2d 1034, 1039 (Ind. Ct. App. 2004) (patient's refusal to accept his mental illness and cooperate with his treatment, paired with his history of mental health issues and destructive behavior, was sufficient to support a finding of grave disability), *trans. denied*. Accordingly, we affirm the trial court's commitment order.

[18] Affirmed.

Bradford, C.J., and Baker, J., concur.