


FILED

Feb 03 2026, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

In the Matter of the Civil Commitment of: A.D.,

*Appellant-Respondent*

v.

Community Fairbanks Behavioral Health,

*Appellee-Petitioner*

---

February 3, 2026

Court of Appeals Case No.
25A-MH-3292

Appeal from the Marion Superior Court

The Honorable David Certo, Judge

Trial Court Cause No.
49D08-2512-MH-58042

---

**Opinion by Judge Brown**
Judge Weissmann and Senior Judge Robb concur.

**Brown, Judge.**

[1] A.D. appeals her involuntary civil commitment and claims it was not supported by sufficient evidence. We affirm.

## Facts and Procedural History

[2] A.D. is an eighteen-year-old female who was admitted to Community Fairbanks Behavioral Health ("Community") on December 7, 2025. A.D.'s mother brought her in for evaluation after she became physically aggressive. This was A.D.'s second admission in just under one month. The attending physician diagnosed A.D. with schizoaffective disorder, bipolar type. On December 9, 2025, Community filed an application for Emergency Detention alleging that A.D. was mentally ill and gravely disabled. Specifically, the application noted that A.D. was exhibiting "worsening agitation, euphoric mood, decreased sleep, racing thoughts, distractibility and delusional and disorganized thinking" as well as "poor insight and judgment." Appellant's Appendix Volume II at 12. The court granted the application.

[3] On December 16, 2025, Community filed a petition, along with a physician's statement, seeking a temporary mental health commitment for a period not to exceed ninety days. The court held a hearing on December 22, 2025. In support of the temporary commitment, Community presented the expert testimony of psychiatrist Dr. Ishrat Bhat, as well as the testimony of A.D.'s mother, N.D. A.D. also testified.

[4] Dr. Bhat testified that, at the time of admission, A.D. "was exhibiting manic symptoms and agitation, was not sleeping, experiencing racing thoughts, was easily distractible, confused, exhibited flight of ideas, and was also exhibiting some delusional thinking." Expedited Transcript at 6. Dr. Bhat stated that he diagnosed A.D. with a mental illness; namely, "schizoaffective disorder, bipolar type." *Id.* at 7. In stating the reasons for his diagnosis, he noted that he had evaluated A.D. on several occasions, including the morning of the hearing. He stated that he had "been a witness to the symptoms" and that she also had "an established diagnosis from the past." *Id.* He explained that schizoaffective disorder, bipolar type, "is a condition where people experience symptoms of a mood disorder and symptoms of psychosis." *Id.* He stated that during his interactions with A.D., he had seen her "talking to herself, yelling, screaming, laughing for no apparent reason. She also had mood instability, anger, agitation." *Id.* Dr. Bhat explained that A.D. had a documented history of mental health treatment dating back to 2022, including treatment for depression, self-harm, anxiety, and suicidal thoughts.

[5] Dr. Bhat testified that, based on her current state at the time of the hearing, he did not believe that A.D. could "engage in a job, earn a living for herself, and without family support, she will not have a place [] to stay." *Id.* at 8. Dr. Bhat testified that A.D. "does not have much insight into her mental illness" and believes that "anxiety is causing her to have symptoms." *Id.* He further stated that, on the morning of the hearing, she reported that "she's been given a wrong diagnosis" and that she did have schizophrenia but that "she's not schizo." *Id.*

Dr. Bhat explained that A.D.'s lack of insight affected her ability to take her medications and that she "has had two back-to-back hospitalizations" because "she was not taking her medications as prescribed and started experiencing a manic and psychotic episode." *Id.* Dr. Bhat stated that he did not believe that A.D. could function independently due to her mental illness. He emphasized that she had no plan on how to find housing and that he did not believe a shelter would be appropriate because "if she's getting paranoid about other residents, she's yelling, she's screaming, getting into arguments" a shelter would be unable to keep her. *Id.* at 9. He noted that "agitation with other residents and screaming" had been occurring with A.D. at the hospital. *Id.* Dr. Bhat opined that a temporary commitment was necessary to "start her on a long-acting injectable medication" and provide improvement in A.D.'s condition. *Id.* at 11. Dr. Bhat testified that A.D. had not been cooperative with having blood drawn in the hospital, which was making it very difficult to manage her treatment on mood stabilizing medication.

[6] On cross-examination, Dr. Bhat was unable to pinpoint the exact date A.D. had been first diagnosed with schizoaffective disorder, conceding that "you need to have a minimum of six months of that symptomatology" to obtain that diagnosis. *Id.* at 15. Dr. Bhat advised that he believed it was likely that Community "established that timeline" when she had been admitted just one-month prior to the current hospitalization, or that the timeline was "established in an outside facility." *Id.*

N.D. testified that A.D. had recently been living with her after release from an admission to Community one month earlier. N.D. stated that A.D. "nonstop would yell at me from the second I would walk into the door until I went to bed . . . about random different things." *Id*. at 26. She would yell and pace all night and was scared that "somebody was breaking into the house" or she would report that "there were aliens that were walking around the house." *Id*. N.D. stated that A.D. "is violent." *Id*. at 27. In describing the events that led up to the current hospitalization, N.D. testified that A.D. "push[ed]" her, "threw" her dog, and hit her boyfriend who had intervened to keep A.D. from further attacking N.D. *Id*. N.D. "called the cops" to report a "mental health situation" and also because A.D. stated that "she no longer wanted to live with us." *Id*. N.D. stated that while driving to Community, A.D. was "yelling . . . screaming," "punching" the car door and almost breaking it, shaking N.D.'s head enough to break her earring, and saying that N.D. and her boyfriend "were kidnapping her." *Id*. at 28. N.D. testified that A.D. "tried to open the door on the interstate, screaming to people, help her, she's being kidnapped" before jumping "in the front seat" of the vehicle "to grab a phone to call 911." *Id*. A.D. called 911 and told the dispatcher "that she was being kidnapped by her mom and her mom's boyfriend." *Id*. N.D. stated that A.D. had always been inconsistent about taking her medication as prescribed, that she believed that A.D. was in need of mental health treatment, and explained that she had "been trying to get [A.D.] help for five years now." *Id*. at 30. N.D. stated that A.D. had no way to provide for herself, did not even have a phone, and that she was unsure whether she would let A.D. live with her upon release and that she

definitely did not want A.D. to live with her unless she was on a long-acting injectable medication.

[8]     A.D. testified and explained that the only reason she ever yelled at her mother was because she "wanted to drive on [her] permit." *Id*. at 37. She described herself as getting "a little stressed out" and having an "antisocial anxiety thing." *Id*. at 38. She stated that she called 911 from the car on the way to Community because she did not "want to go back" to Community because she had just been there "a month ago" and she did not "need to go again" and was "doing perfectly fine." *Id*. at 39. She also testified that she called 911 while riding in the car with her mother, stating, "[j]ust because you know the person doesn't mean that some bad stuff's [not] going to happen to you." *Id*. A.D. admitted that she opened the door of the moving car on the interstate because she "was getting manic as heck, bro" and "was getting impulsive-type thoughts, and they were racing in [her] head." *Id*. When asked where she would live if she "went home today," A.D. stated that she "would probably live with [her] mom" because she had "no place else to go" and has "a pet rabbit." *Id*. at 40. A.D. claimed that she understood "the full meaning behind meds" but that she did not want to get "the one shot" because it would "hurt." *Id*. at 41. She stated that she did not have a job and did not know how to apply for one. She indicated that she could probably obtain a job in the future and then an apartment, but she had no clear plan on how to do so.

[9]     At the conclusion of the hearing, the court noted A.D.'s behavior during the hearing and that A.D.'s inability to "regulate" her emotions in the hospital

tended to "point toward [her] [in]ability to regulate them out of the hospital." *Id.* at 49.[1]  The court explained in relevant part:

> Under these circumstances . . . I find that you're gravely disabled as a matter of law because you can't make safe decisions.  Your plan for housing is disorganized and inadequate, especially in light of the weather conditions outside.
>
> * * * * *
>
> I find that the diagnosis Dr. Bhat opined about today, schizoaffective disorder, bipolar type, is in fact supported by the evidence and uncontradicted.  The prior diagnosis was the same.  Dr. Bhat described both the mood symptoms and the delusions that constitute his diagnosis, and I find that the evidence is clear and convincing.  I also find that his testimony concerning [A.D.'s] inability to regulate her conduct is confirmed by [A.D.] herself.  She has to be willing to submit to blood draws or she can't get good therapy.  She has to be willing to take medication consistently or she won't get good relief.

*Id.*

[10] Accordingly, the court entered its order granting the petition for involuntary commitment finding that: A.D. suffers from schizoaffective disorder, bipolar type, which is a mental illness as defined in Ind. Code § 12-7-2-130; A.D. is

---

[1] The video recording of the hearing indicates that, although her microphone was muted, during the testimony of Dr. Bhat, A.D. was talking and yelling at the video monitor.  When the trial judge questioned her about that behavior, she stated that she "was losing [her] mind a little bit," "freaking out, " and "just going off" because she "had an issue with that doctor from the start, saying he was writing down the wrong things from [her] that [she] was saying when he would ask questions." Expedited Transcript at 44.  She stated that she told Dr. Bhat that "he was getting fired for it." *Id.*

gravely disabled as defined by Ind. Code § 12-7-2-96; A.D. is in need of custody, care and treatment at Community for a period of time not expected to exceed ninety days; such placement is the least restrictive environment suitable for treatment and stabilization as well as protecting A.D.; and the benefits of the treatment plan outweigh any risks of harm. The court ordered A.D. involuntarily committed to Community until March 22, 2026, unless discharged prior.

## Discussion

[11] In Indiana, an individual who is alleged to be mentally ill and either dangerous or gravely disabled may be committed to a facility for not more than ninety days under Ind. Code Chapter 12-26-6. The petitioner is required to prove by clear and convincing evidence that the individual is mentally ill and either dangerous or gravely disabled and detention or commitment of that individual is appropriate. Ind. Code § 12-26-2-5(e). The clear and convincing evidence standard is an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *T.D. v. Eskenazi Health Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). We consider only the evidence favorable to the judgment and all reasonable inferences drawn therefrom and do not reweigh the evidence or judge the credibility of witnesses. *Id.* If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. *In re Commitment of Heald*, 785 N.E.2d 605, 613 (Ind. Ct. App. 2003), *trans. denied.*

[12] A.D. does not challenge the sufficiency of the evidence supporting the trial court's finding that she is gravely disabled. Rather, her sole challenge on appeal is to the trial court's finding that she suffers from a mental illness. Mental illness is defined in relevant part as "a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function . . . ." Ind. Code § 12-7-2-130. A.D. asserts that she "does not dispute that schizoaffective disorder, bipolar type, is a mental illness under the statute. Her challenge is simply that the doctor's equivocal testimony failed to prove by clear and convincing evidence that she was suffering from schizoaffective disorder, bipolar type." Appellant's Brief at 5.

[13] Here, when asked for his expert opinion as to A.D.'s diagnosis, Dr. Bhat unequivocally stated that he had diagnosed A.D. with a mental illness; namely, "schizoaffective disorder, bipolar type." Expedited Transcript at 7. He explained that schizoaffective disorder, bipolar type, "is a condition where people experience symptoms of a mood disorder and symptoms of psychosis." *Id*. In explaining the reasons for his diagnosis, he stated that he had evaluated A.D. on numerous occasions and had "been a witness to the symptoms," and that she also had "an established diagnosis from the past." *Id*. He stated that during his interactions with A.D., he had seen her "talking to herself, yelling, screaming, laughing for no apparent reason. She also had mood instability, anger, agitation." *Id*. Each of these behaviors was consistent with and confirmed the accuracy of the diagnosis.

[14] We acknowledge that, on cross-examination, Dr. Bhat conceded that schizoaffective disorder requires a minimum six-month duration of symptoms, that he had not observed A.D. for that duration of time, and that he was unaware of when she was first diagnosed or how long she had been experiencing symptoms. However, contrary to A.D.'s suggestions, this concession did not render the evidence that A.D. suffers from a mental illness insufficient to support the temporary commitment.

[15] We find our decisions in *C.J. v. Health and Hosp. Corp. of Marion Cnty*, 842 N.E.2d 407 (Ind. Ct. App. 2006) and *In re Commitment of Steinberg*, 821 N.E.2d 385 (Ind. Ct. App. 2004) instructive. In *C.J.*, the appellant challenged his temporary commitment asserting that there was insufficient evidence presented that he suffered from a mental illness. The expert doctor testified that, based upon his examination of C.J. and review of his medical record, C.J. suffered "from substance-induced psychosis and poly-substance dependence." 842 N.E.2d at 410. He further testified that he suspected C.J. also suffered from schizophrenia but could not confirm that diagnosis because "the substances have to be out of the system for four [ ] weeks before you can confirm." *Id.* (record citation omitted). We determined that this testimony was sufficient to support the trial court's finding that C.J. was mentally ill pursuant to the commitment statute. *Id.*

[16] Similarly, in *Steinberg*, the appellant argued that there was insufficient evidence to support the trial court's finding that he suffered from a mental illness because the expert doctor only testified that he had a "working diagnosis" of

schizophrenia "along with other potential disorders such as psychotic disorder NOS (not otherwise specified), delusional disorder, and some sort of thought disorder." *Steinberg*, 821 N.E.2d at 388. We disagreed with the appellant's suggestion that a working diagnosis is somehow less reliable than an actual diagnosis and determined that because the trial court could reasonably rely on the information provided by the expert doctor, we would not disturb the court's finding that the hospital satisfied the "mentally ill" element of the commitment statute. *Id*.

[17] In short, we agree with Community that, for the purposes of an involuntary commitment, Ind. Code § 12-7-2-130 does not require "a definitive, textbook diagnosis." Appellee's Brief at 10. Based upon our thorough review of the record, which includes the videorecording of the hearing, we conclude that clear and convincing evidence supports the trial court's conclusion that A.D. suffers from a mental illness.

[18] For the foregoing reasons, we affirm the trial court's Order of Temporary Commitment.

[19] Affirmed.


Weissmann, J., and Robb, Sr.J., concur.


ATTORNEYS FOR APPELLANT

Talisha Griffin
Marion County Public Defender Agency

Appellate Division
Indianapolis, Indiana

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Abby V. DeMare
Rani B. Amani
Ice Miller LLP
Indianapolis, Indiana