## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 16 2020, 9:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Katherine N. Worman
Evansville, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Involuntary Commitment of Y.K., <br><br> *Appellant,* <br><br> v. <br><br> Deaconess Hospital, April Toelle and Selah House, <br><br> *Appellee.* | December 16, 2020 <br><br> Court of Appeals Case No. 20A-MH-1116 <br><br> Appeal from the Vanderburgh Superior Court <br><br> The Honorable Leslie Shively, Judge <br><br> The Honorable Jill Marcrum, Magistrate <br><br> Trial Court Cause No. 82D05-2001-MH-431 |

**Pyle, Judge.**

## Statement of the Case

Y.K. ("Y.K.") appeals the trial court's order extending her involuntary temporary commitment.[1] Y.K. argues that there was insufficient evidence to support the extension of her temporary involuntary commitment because Selah House ("Selah House") did not prove by clear and convincing evidence that she was mentally ill and a danger to herself or gravely disabled. Concluding that there was sufficient evidence that Y.K. was both mentally ill and gravely disabled, we affirm the trial court's order.

We affirm.

## Issue

Whether there was sufficient evidence to support the trial court's order extending Y.K.'s involuntary temporary civil commitment.

## Facts

On January 29, 2020, Y.K. was admitted to the Deaconess Midtown emergency room ("Deaconess") due to swelling in her lower extremities. Upon

---

[1] In *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 n.1 (Ind. 2015), the Indiana Supreme Court explained:

> In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. Involuntary civil commitment may occur under four circumstances if certain statutorily regulated conditions are satisfied: (1) "Immediate Detention" by law enforcement for up to 24 hours; (2) "Emergency Detention" for up to 72 hours; (3) "Temporary Commitment" for up to 90 days; and (4) "Regular Commitment" for an indefinite period of time that may exceed 90 days.

(internal citations omitted).

admission, Y.K. weighed 66 pounds. Deaconess determined that Y.K.'s swelling had developed due to complications associated with malnutrition. That same day, a Deaconess physician filed an application for emergency detention, which was approved by the trial court.

[4] On February 4, 2020, Deaconess filed a petition for approval of attending physician's treatment plan, a physician's statement, and a report following emergency detention. The physician's statement was signed by Dr. Hemapriya Reddy ("Dr. Reddy"), who had diagnosed Y.K. with an eating and psychiatric disorder, specifically, Anorexia Nervosa. Dr. Reddy also stated that Y.K.'s eating disorder was "causing harm to [her]self [,] causing severe malnutrition, and complications[.]" (App. Vol. 2 at 26). The next day, Deaconess filed a petition for temporary commitment.

[5] On February 6, 2020, the trial court held a hearing on the petition for temporary commitment. Dr. Reddy, Y.K.'s father, and Y.K. testified at the hearing. Dr. Reddy testified that he had diagnosed Y.K. with Anorexia. He explained the complications Y.K. had already developed, including fluid accumulation in her lower extremities, belly, and around her heart. Dr. Reddy also detailed the potential prognosis of Y.K.'s continued malnutrition, which included debility and possibly death. Dr. Reddy opined that Anorexia is both a physical and a mental condition, but that it is "mostly a psychiatric thing because it's all in their mind." (Tr. 9-10).

[6] Dr. Reddy believed that Y.K.'s diagnosis would "definitely impair" her ability to function outside of a hospital setting. (Tr. 10). Dr. Reddy further explained that Y.K.'s treatment plan included her being transferred to the I.U. Medical Center, which possesses a unit that specializes in eating disorders. Dr. Reddy also noted that Y.K.'s current weight was 73 pounds, and that given her age and height, a normal weight would be "around 105, 110 pounds[.]" (Tr. 18).

[7] During Y.K.'s testimony, she disagreed with her Anorexia diagnosis and explained that she had a passion for health and taking care of her body. According to Y.K., she did not need counseling on eating disorders or mental health because she was aware of what she was thinking and doing. Following Y.K.'s testimony, the trial court granted the petition for Y.K.'s temporary commitment with approval for transfer to the I.U. Medical Center. On February 7, Y.K. was transferred to the I.U. Medical Center.

[8] In April 2020, Y.K. was transferred to Selah House. On May 5, 2020, Selah House filed a physician's statement and report requesting extension of temporary commitment. The physician's statement was signed by Dr. Thomas Scales ("Dr. Scales"), who had performed Y.K.'s psychiatric assessment at Selah House and diagnosed her with a psychiatric disorder called "Avoidant Restrictive Food Intake Disorder[.]" (App. Vol. 2 at 45). A petition for extension of temporary commitment was also filed on May 5.

The trial court held a hearing on the extension petition on May 6, wherein Dr. Scales and Y.K. testified.[2] Dr. Scales explained that he was a board-certified psychiatrist, and that in addition to performing Y.K.'s psychiatric assessment, he had examined her two other times. Dr. Scales stated that Y.K. weighed 84 pounds when she was admitted to Selah House. He described Y.K. as "very underweight[]" and explained that her weight at that point was "approximately 60% of her ideal body weight[.]" (Tr. 28). Dr. Scales explained that Y.K. suffered from Avoidant Restrictive Food Intake Disorder, which he described as follows:

> [It] is characterized by (indiscernible) of food or aversion to (indiscernible) consequences of eating certain foods or by avoiding some certain sensory characteristics of food that kind of results in not being able to meet [the] body's energy needs. It kind of manifests by weight loss, needing to be on nutritional supplements, either gastric feedings[.]
>
> * * *
>
> It's a disorder in eating pattern that's characterized by concern about the adverse of consequences of eating certain foods. (Indiscernible) based on the sensory characteristics that results in weight loss and the body's inability or failure to meet its basic energy requirements. (Indiscernible) loss can be severe. It's characterized by being dependent on supplements, nutritional supplements, or [i]nternal or naso-gastric tube feeding.

---

[2] This hearing was conducted remotely, and there were technical difficulties throughout the hearing, consisting of the participants' speech fading in and out. This resulted in several instances of indiscernible testimony in the transcript.

(Tr. 25, 28). Dr. Scales noted that Y.K. did not have a medical condition or food allergy that caused her low weight. Dr. Scales did explain that Y.K. had complained of experiencing acid reflux when eating certain food.

[10] Dr. Scales described Y.K.'s recommended treatment plan, which included meeting with a dietician, a therapist, group psychotherapy, psychiatric care, and medical care. Dr. Scales explained:

> I believe that being in a residential or i[n]patient level of care is the appropriate level of care given the medical complications that can occur during the process of re-feeding, and also to provide enough support for her to get the nutrition that she needs. She needs three meals a day and two snacks a day. Or actually, perhaps three snacks a day. And at home or a (indiscernible) structured environment she wouldn't get the support that she would need, the nutritional support and the psychological support, and (indiscernible) support. In an inpatient setting[,] she has access to nurses 24/7 and she's able to get her vitals checked daily and she will have her blood drawn at least twice a week (indiscernible) necessarily. It's hard to do that – this level of care is hard to do on the less structured [environment].

(Tr. 33-34).

[11] Dr. Scales also expressed that his primary concern was Y.K.'s physical and mental health. Dr. Scales noted that while Y.K. did have some insight into her mental illness, he believed that Y.K. had trouble "understanding . . . the risk of [not] having a structured environment [and] that she [is] currently [in] the process of the healing." (Tr. 36). When asked whether Y.K. presented a substantial risk that she may harm herself, Dr. Scales answered as follows:

> Yes, I think if she (indiscernible) doesn't have adequate nutrition, doesn't take in enough nutrition she could harm herself and

experience some complications that she experienced before, like the pericardial effusion (indiscernible). She also has osteoporosis that could worsen, too. She could fall and fracture a bone. So[,] there is a serious risk of (indiscernible) receiving treatment.

(Tr. 36). When asked whether he believed Y.K. could provide for herself, Dr. Scales answered "[n]o, I don't think she – she's not caring for her basic nutritional needs. She's not providing for herself in providing basic nutritional needs." (Tr. 37). He further explained that Y.K.'s failure to meet her nutritional needs was "due to her diagnosis of avoidant restrictive food intake disorder." (Tr. 37). Dr. Scales concluded that based on Y.K.'s mental illness and medical history, Y.K. was gravely disabled.

[12]     Y.K. testified that prior to her hospitalizations, she had eaten a plant-based diet. She explained that she had experienced digestive issues that had prevented her from eating a variety of foods. Y.K. also stated that the cause of her weight loss and admission to the emergency room was not her fault. Y.K. explained that she had a passion for taking care of her body and that she did not have body image issues. Thereafter, the trial court found that Y.K. suffered from a mental illness and was a danger to herself and gravely disabled and ordered that Y.K.'s temporary commitment be extended. Y.K. now appeals.

# Decision

[13]     At the outset, we note that an appellee's brief was not filed in this appeal. Indiana Appellate Rule 45(D) provides in relevant part that an appellee's failure to timely file an appellee's brief may result in reversal of the trial court on the

appellant's showing of prima facie error. "When the Appellee fails to submit an answer brief 'we need not undertake the burden of developing an argument on the [A]ppellee's behalf.'" *Front Row Motors, LLC v. Jones*, 5 N.E.3d 753, 758 (Ind. 2014) (quoting *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006)). "Instead 'we will reverse the trial court's judgment if the [A]ppellant's brief presents a case of prima facie error.'" *Front Row Motors*, 5 N.E.3d at 758 (quoting *Trinity Homes*, 848 N.E.2d at 1068). "Prima facie error in this context is defined as, at first sight, on first appearance, or on the face of it." *Front Row Motors*, 5 N.E.3d at 758 (internal quotation marks and citation omitted). However, even in light of this relaxed standard, we still have the obligation to correctly apply the law to the facts in the record to determine whether reversal is required. *WindGate Properties., LLC v. Sanders*, 93 N.E.3d 809, 813 (Ind. Ct. App. 2018).

[14] Y.K. contends that there was insufficient evidence to support the extension of her involuntary temporary commitment. Specifically, she disputes the trial court's determination that she was: (1) mentally ill; and (2) a danger to herself or gravely disabled. We will address each argument in turn.[3]

[15] In Indiana, "'[t]the purpose of civil commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is at stake.'" *T.K.*

---

[3] Y.K.'s 90-day temporary commitment has expired, and therefore, the issue is moot. However, the issue is one of great importance that is likely to recur. Accordingly, we will address the issue on its merits. *See Golub v. Giles*, 814 N.E.2d 1034, 1036 n.1 (Ind. Ct. App. 2004), *trans. denied.*

*v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015) (quoting *In re Commitment of Roberts*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000)). The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *Id.*

[16] To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by clear and convincing evidence. *In re Commitment of G.M.*, 743 N.E.2d 1148, 1151 (Ind. Ct. App. 2001). Clear and convincing evidence is defined as an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *T.D. v. Eskenazi Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). In order to be clear and convincing, the existence of a fact must be highly probable. *Id.* When we review the sufficiency of the evidence supporting an involuntary commitment, we will affirm if, "considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence." *T.K.*, 27 N.E.3d at 273 (quotation and citation omitted).

[17] To obtain an involuntary commitment, the petitioner is "required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." IND. CODE § 12-26-2-5(e) (format altered).

## 1. Mental Illness

For purposes of involuntary commitment, mental illness is defined as a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function. I.C. § 12-7-2-130. Turning to Y.K.'s first contention, she does not challenge her psychiatric disorder diagnosis. Rather, she argues that her disorder neither disturbs her thinking, feeling, or behavior nor impairs her ability to function. We disagree.

Dr. Scales testified that he had performed a psychiatric assessment of Y.K. and had evaluated her two other times. Dr. Scales diagnosed Y.K. with a psychiatric disorder, specifically Avoidant Restrictive Food Intake Disorder. This disorder is characterized by "avoiding some certain sensory characteristics of food that kind of results in not being able to meet [the] body's energy needs." (Tr. 25). According to Dr. Scales, Y.K.'s disorder impaired her ability to function because she was not meeting her basic and essential nutritional needs.

From this evidence, the trial court could have reasonably found that there was clear and convincing evidence that Y.K. was mentally ill because she had a psychiatric disorder, Avoidant Restrictive Food Intake Disorder, which was substantially disturbing her thinking, feeling, behavior and ability to function. Y.K.'s argument to the contrary is an invitation to reweigh the evidence, which we may not do. *See T.K.*, 27 N.E.3d at 273.

## 2. Gravely Disabled

[21]     Y.K. next challenges the extension of her temporary commitment by arguing that there was insufficient evidence that she was dangerous or gravely disabled. As noted above, to obtain an involuntary commitment, the petitioner is "required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." I.C. § 12-26-2-5(e) (format altered). Because this statute is written in the disjunctive, we will affirm if the evidence establishes that Y.K. was "either dangerous *or* gravely disabled." *Id.* (emphasis added); *see also M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005) ("It is important to note that in order to carry its burden of proof, Clarian only had to prove that M.Z. was either gravely disabled *or* dangerous. It did not have to prove both of these elements.") (emphasis in original), *trans. denied*. We conclude that the evidence is sufficient to show that Y.K. was gravely disabled, and therefore, we need not address the trial court's findings regarding whether Y.K. was dangerous.

[22]     Gravely disabled is defined as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
>> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>>
>> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. § 12-7-2-96. As we have often noted, because this statute is written in the disjunctive, a trial court's finding of grave disability survives if we find that

there was sufficient evidence to prove either that the individual was unable to provide for her basic needs or that her judgment, reasoning, or behavior is so impaired or deteriorated that it results in her inability to function independently. *Civil Commitment of W.S. v. Eskenazi Health, Midtown Cmty. Health*, 23 N.E.3d 29, 34 (Ind. Ct. App. 2014), *trans. denied*.

[23] Y.K. asserts that the evidence does not show that she was "gravely disabled." Specifically, she argues that there was no evidence presented that she was "unable to provide herself with clothing, shelter, or other essential human needs[,]" including food. (Y.K.'s Br. 13).

[24] However, the record reveals that there was evidence that Y.K. had failed to provide herself with food or meet other essential needs. When Y.K. was first admitted to a hospital, she weighed 66 pounds and exhibited swelling in her lower extremities. The hospital determined that Y.K.'s swelling had developed due to complications associated with malnutrition. After three months of inpatient treatment, Y.K.'s weight had increased to 84 pounds. However, Dr. Scales explained that Y.K. continued to be "very underweight[]" and that her weight was "approximately 60% of her ideal body weight[.]" (Tr. 28). Dr. Scales opined that Y.K.'s eating disorder had "resulted in her having significant weight loss and having actually really severe medical complications[.]" (Tr. 26). When asked whether he believed Y.K. could provide for herself, Dr. Scales explained that Y.K. was not caring for herself by providing basic nutritional needs. Furthermore, although Dr. Scales stated that Y.K. had some

insight into her mental illness, he explained that he did not believe that she fully grasped the severity of the risks associated with her eating disorder.

[25] Based on the above, we conclude that there was sufficient evidence that as a result of Y.K.'s mental illness, she was gravely disabled for purposes of her involuntary temporary commitment. Therefore, we affirm the trial court's commitment extension order.

[26] Affirmed.

Kirsch, J., and Tavitas, J., concur.