


FILED

Jun 26 2024, 10:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

In the Matter of the Civil Commitment of A.P.,

*Appellant-Respondent*

v.

Community Health Network, Inc.,

*Appellee-Petitioner*

---

June 26, 2024

Court of Appeals Case No.
24A-MH-218

Appeal from the Hamilton Superior Court

The Honorable William Hughes, Judge

Trial Court Cause No.
29D03-2401-MH-2

---

**Opinion by Judge Riley**
Judges Kenworthy and Felix concur.

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, A.P., appeals the trial court's Order of involuntary regular commitment.

We affirm.

## ISSUE

A.P. presents this court with one issue on appeal, which we restate as: Whether there was sufficient evidence to support the trial court's Order of involuntary regular commitment, which concluded that A.P. was gravely disabled and dangerous because of his mental illness.

## FACTS AND PROCEDURAL HISTORY

This is A.P.'s second appeal of a mental health commitment order. Previously, this court dismissed his appeal of a second temporary commitment order as being moot. *See A.P. v. Cmty. Health Network, Inc.*, 2023 WL 5693625 (Ind. Ct. App. Sept. 5, 2023). The court's findings and orders in these previous proceedings reflected that A.P. is convinced he suffers from Amyotrophic lateral sclerosis (ALS), a progressive neurological disorder, and has sought the opinion of Indiana physicians, as well as the opinions of doctors from Chicago, the Mayo Clinic, and the Cleveland Clinic. A.P. has gone to almost every relevant program and has submitted to hundreds of plasma tests, eight EMGs, two barium swallow tests, and a spinal tap muscle biopsy. Despite all those

tests and appointments, A.P. has never been diagnosed with ALS or any other terminal disease.

[5] On January 9, 2024, A.P. was committed to Community Fairbanks Behavioral Health on an emergency detention. Shortly after A.P.'s admission, Community Health Network, Inc.'s (Community) physician, Dr. Jason Ehret (Dr. Ehret), filed a petition for a commitment hearing and a physician's statement, asserting that A.P. was suffering from Delusional Disorder, Somatic Type, was dangerous to himself as he was seeking assisted suicide, was gravely disabled as he was not leaving his house, and was in need of a regular commitment.

[6] On January 23, 2024, the trial court conducted a hearing on Community's petition, at which the trial court took judicial notice of the findings and orders in A.P.'s two prior temporary commitment proceedings, as well as this court's opinion in *A.P.* During the proceedings, A.P.'s father (Father) testified that during A.P.'s most recent temporary commitment:

> [w]e were really surprised because it seemed like his mood was more stable and we could have more thoughtful interactions and exchanges. It wasn't all focused on ALS and dying. It was more, I mean there w[ere] actually times that we would have laughter which is almost non-existent and [] there was actually a couple times that he was open to ideas even like [] maybe this is something other, this is a neurological condition, probably terminal, but maybe it's not ALS.

(Transcript Vol. II, p. 11). However, after A.P.'s temporary commitment expired, Father noticed that it "was a challenge" to get A.P. to follow up with

treatment for his mental illness. (Tr. Vol. II, p. 9). A.P.'s personal hygiene deteriorated, he no longer bathed regularly, and his condominium—which was owned by his parents who paid all associated expenses—needed to be cleaned "to get the smell [of body odor] out of it." (Tr. Vol. II, p. 8). A.P. had not been employed since 2021, had run out of money several months prior to the commitment hearing, and had amassed some debts. Father testified that his conversations with A.P. often drifted "into discussions about how he doesn't want to be alive, that ALS is horrible; it's hell on earth." (Tr. Vol. II, p. 10). Father explained that a year earlier, in January 2023, prior to A.P.'s first temporary commitment, "things were really bad" in terms of A.P.'s suicidal ideation. Father informed the court that as of the date of A.P.'s current hospitalization, A.P.'s expressions of suicidal ideations have become similar to the ones he experienced in January 2023.

[7] Dr. Ehret, who also testified in A.P.'s most recent temporary commitment proceeding, examined A.P. daily since his admission on January 9, 2024, and testified in support of a regular commitment. He explained that A.P. presented with Delusional Disorder, Somatic Type, with a DSM-5 diagnosis of "major depression superimposed on the delusional disorder." (Tr. Vol. II, p. 19). Dr. Ehret clarified that these are separate diagnoses, which are combined for research and study purposes. He noted that A.P. continued to believe that he had experienced a "massive weight loss" with corresponding continued muscle wasting, even though A.P.'s weight and appearance have remained consistent. (Tr. Vol. II., p. 19). In fact, A.P.'s muscular testing returned as being normal.

In essence, Dr. Ehret concluded that A.P. was presenting with the same symptoms as during his previous temporary commitments.

[8] According to Dr. Ehret, A.P.'s mental illness impacts his ability to function independently, as A.P. is "convinced that he [] has difficulty walking or he's not even able to sit [] appropriately. He's to the point where he can't drive [] and he bases [] this feeling that he's got this terminal illness that's causing the weakness." (Tr. Vol. II, p. 20). Dr. Ehret maintained that A.P. fails to have insight into his mental illness, and that A.P. "suffers a substantial impairment in his judgment or reasoning that leads to an inability to function independently." (Tr. Vol. II, p. 20). Specifically, Dr. Ehret clarified that A.P.'s mental illness impacted his ability to live independently without family support. Dr. Ehret also concluded that A.P. presented a substantial risk of harming himself. In support of his conclusion, Dr. Ehret explained that individuals diagnosed with "delusional disorder with somatic symptoms [are in] a high-risk group for suicide[, as] [t]he attempts are [] high, up to 20%." (Tr. Vol. II, p. 21). Dr. Ehret noted that this high percentage is even more exacerbated in A.P. because he "has the view that he has a terminal illness for which he needs to end his life." (Tr. Vol. II, p. 21).

[9] Dr. Ehret requested the trial court to grant the petition for a regular commitment, expected to exceed ninety days, because he believed A.P.'s condition to be ongoing and not quickly resolved. He testified that his proposed treatment plan consisted of anti-depressant medication for A.P.'s "significant depressive symptoms," as well as long-acting injectable anti-

psychotic medication to treat the delusional disorder, similar to what A.P. received during his prior temporary commitment. With respect to a possible transition to outpatient therapy, Dr. Ehret was considering a number of options since people with delusional disorders do better when they are more engaged and active than "where people are isolating and by themselves." (Tr. Vol. II, p. 22). Dr. Ehret also mentioned the possibility of Electro Convulsive Therapy, which had been proven successful for delusional disorder, but assured the trial court that he wanted to try medication and therapy first. He explained that treatment could significantly improve a patient's mood, as well as reduce the intensity or severity of the delusions to the point where the patient can try to engage in some therapeutic measures. Without treatment, A.P.'s "biggest risk is, obviously, suicide given his hopelessness and [] concerns for . . . his health." (Tr. Vol. II, p. 24).

[10] A.P. testified at the hearing. He insisted that he did not suffer from a mental illness and that any ailment he suffered from was neuromuscular in nature. He explained that he was "committed to finding a competent physician, competent neurologist, neuromuscular specialist who is going to see the process through until it's finished[.]" (Tr. Vol. II, p. 36). Even though he was focused on getting a diagnosis of his underlying problem, he did not rule out attempting to obtain medically assisted suicide if the ultimate diagnosis was ALS or another terminal illness.

[11] At the close of the evidence, the trial court granted Community's request for a regular commitment, concluding that Community established that A.P. was

suffering from Delusional Disorder Somatic Type and Major Depression, was dangerous to himself, was gravely disabled, and was in need of custody, care and treatment expected to exceed ninety days. The trial court noted specifically at the hearing that it had

> evidence in front of [it] in the form of the testimony of a qualified psychiatrist that [A.P.] suffers from a mental illness. I have visible evidence of my own that I can see that in fact [ ] it appears that there is some delusion ongoing [ ] given the fact that he believes he can't walk, he can't drive, he can't do all these things and I've watched him do those things throughout the course of this proceeding. I don't know whether there is an underlying neurological problem or not. All I know is that there is a delusion that the extent . . . of that problem and that [A.P.] has exhibited previously on two occasions and I believe since that in regard to the statement of his [F]ather, a tendency to at least consider doing away with himself and it's not assisted suicide that I'm worried about. I don't think that we have to worry about an assisted suicide with this diagnosis, but I'm concerned that [A.P.] might seek to harm himself otherwise because of his depression and other mental illness.

(Tr. Vol. II, p. 55). As a special condition, the trial court ordered, among others, that A.P. take all medications as prescribed, attend all clinic sessions as scheduled, and that Electro Shock Therapy may be performed only upon additional order from the court.

[12] A.P. now appeals. Additional facts will be provided if necessary.

## DISCUSSION AND DECISION

[13] A.P. contends that there was insufficient evidence to support his involuntary regular commitment because Community did not prove by clear and convincing evidence that he is gravely disabled and a danger to himself.

[14] "'[T]he purpose of civil commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is at stake.'" *T.K. v. Dep't of Veterans Affs.*, 27 N.E.3d 271, 273 (Ind. 2015) (quoting *In re Commitment of Roberts*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000)). "The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements." *Id*.

[15] To satisfy due process, the facts justifying an involuntary commitment must be proved by clear and convincing evidence. *In re Commitment of G.M.*, 743 N.E.2d 1148, 1151 (Ind. Ct. App. 2001). Clear and convincing evidence is defined as an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *T.D. v. Eskenazi Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). In order to be clear and convincing, the existence of a fact must be highly probable. *Id.* When we review the sufficiency of the evidence supporting an involuntary commitment, we will affirm if, "considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness

credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence." *T.K.*, 27 N.E.3d at 273.

[16] To obtain an involuntary commitment, the petitioner is "required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e). Because the statute is written in the disjunctive, the petitioner need only prove that the individual is either dangerous or gravely disabled to carry the burden of proof. *In the Matter of the Commitment of M.Z. v. Clarian Health Partners*, 829 N.E2d 634, 637 (Ind. Ct. App. 2005). Here, the trial court found that A.P. is mentally ill, gravely disabled, and dangerous to himself. A.P. does not dispute that he is mentally ill. His sole challenge to the sufficiency of the evidence revolves around the trial court's finding that he is gravely disabled and dangerous to himself.

[17] We first consider whether Community presented clear and convincing evidence that A.P. was dangerous to himself. Indiana Code section 12-7-2-53 defines "dangerous" as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." "Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for the person's mental illness." *Commitment of M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 97 (Ind. Ct. App. 2005).

[18]     The record reflects that A.P. was dangerous to himself as a result of his mental illness. Dr. Ehret testified that individuals with delusional disorder are categorized to be at a high risk of suicide—up to 20%. This percentage is even higher in A.P.'s situation because of A.P.'s major depression in which he is convinced that "he has a terminal illness for which he needs to end his life." (Tr. Vol. II, p. 21). A.P.'s Father confirmed that "history shows that [A.P.] is resistant to anything other than pursuing the ALS diagnosis." (Tr. Vol. II, p. 12). A.P. expressed suicidal statements to his family members. A.P.'s Father stated that his conversations with A.P. often "drifted into discussion about how he doesn't want to be alive, that ALS is horrible; it's hell on earth." (Tr. Vol. II, p. 10). Father told the trial court that in January 2023, prior to A.P.'s first temporary commitment, "things were really bad" with respect to A.P.'s suicidal ideation. Father expressly noted that as of the date of A.P.'s current admission, the situation was "similar" to January 2023. Again, as previously, A.P. was making veiled suicide comments and, according to Father's testimony, "there had been more specific ideation around a plan, a time or two." (Tr. Vol. II, p. 10.). Father explained that on the night of A.P.'s current admission, A.P. stated that he didn't "want to live like this." (Tr. Vol. II, p. 11). A.P.'s own testimony confirms a finding of dangerousness as A.P. stated that he would not rule out obtaining medically assisted suicide if he was ultimately diagnosed with ALS or another terminal illness. In this regard, the trial court took judicial notice that in the most recent prior temporary commitment, an express finding had been made that A.P. had purchased a plane ticked to Switzerland to get medically aided suicide. This led the trial court to be "concerned that [A.P.]

might seek to harm himself otherwise because of his depression and other mental illness." (Tr. Vol. II, p. 55).

[19] A trial court is not required to wait until harm has nearly or actually occurred before determining that an individual is dangerous to himself or others. *C.J. v. Health and Hosp. Corp. of Marion Co.*, 842 N.E.2d 407, 410 (Ind. Ct. App. 2006). Here, the trial court received clear and convincing evidence that A.P.'s diagnosis placed him at an extremely high risk for suicide which, coupled with his belief that he had a terminal illness and the continuous suicidal ideations expressed to his family, as well as his testimony at the commitment hearing that he refused to rule out medically assisted suicide if he ever received the terminal diagnosis that he desperately seeks, supported a finding that A.P. was dangerous to himself.[1]

## CONCLUSION

[20] Based on the foregoing, we conclude that clear and convincing evidence was presented to support the trial court's Order of involuntary regular commitment.

[21] Affirmed.

Kenworthy, J. and Felix, J. concur.

---

[1] Because the statute is written in the disjunctive and we affirm the trial court's finding that A.P. was dangerous to himself, we do not address A.P.'s claim that the trial court erred in finding him to be gravely disabled. *See* I.C. § 12-26-2-5(e).

ATTORNEY FOR APPELLANT

Michael Frischkorn
Brand & Morelock
Greenfield, Indiana


ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Sean T. Dewey
Ice Miller, LLP
Indianapolis, Indiana