


**FILED**

Jul 19 2024, 8:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

In the Matter of the
Civil Commitment of A.B.,

*Appellant-Respondent,*

v.

St. Vincent Hospital and Health Care Center, Inc. d/b/a St.
Vincent Stress Center,

*Appellee-Petitioner.*

July 19, 2024

Court of Appeals Case No.
23A-MH-3052

Appeal from the
Marion Superior Court

The Honorable
David Certo, Judge

**Opinion by Senior Judge Robb**
Judges Riley and Pyle concur.

**Robb, Senior Judge.**

## Statement of the Case

[1] A.B. was the subject of a temporary involuntary civil commitment. Although the commitment order has expired, A.B. appeals challenging the validity of the order. Finding the appeal not moot and the evidence insufficient, we reverse and remand with instructions.

## Issues

[2] A.B. raises two issues for our review, the first of which is a threshold issue:

> I. Whether this appeal is not moot, despite the expiration of the commitment order.
>
> II. Whether sufficient evidence was presented to support the trial court's order involuntarily committing A.B. to a mental health facility.

## Facts and Procedural History

[3] A.B. is a twenty-year-old woman who has been diagnosed with unspecified psychotic disorder and cannabis use disorder. She was hospitalized as a result of her mental illness in August and September 2023 prior to this commitment in

November. When she was discharged from her August hospitalization, she did not maintain her prescribed oral medication.

[4] In November, A.B. contacted her parents to pick her up from the Marion County Justice Center. On the way home, A.B. was mumbling under her breath and opened the car door while the car was traveling on the interstate. Although A.B. insisted she was simply throwing something out of the car, her parents decided to take her to the Stress Center. At a stoplight on the way to the hospital, A.B. exited the car and told her parents she was going to check into the Stress Center on her own. She refused to get back into her parents' car, but eventually agreed to being taken to the Stress Center by a hospital security officer.

[5] Dr. Erica Cornett, a psychiatrist at the Stress Center, evaluated A.B. and found her to be "acutely psychotic," "paranoid," and "suspicious" with a "bizarre and illogical" thought process. Appellant's App. Vol. II, p. 20. Dr. Cornett applied for an emergency detention, which the trial court granted, and a hearing for temporary commitment was scheduled.

[6] At the commitment hearing, Dr. Cornett testified to A.B.'s previous Stress Center admission in August when she was also "very paranoid" and "very suspicious." Tr. Vol. II, p. 7. During that admission, A.B. took the prescribed medication, and Dr. Cornett believed A.B. was "a bit better," "not as suspicious," and "not as paranoid" when she was released. *Id.* at 8.

[7] Dr. Cornett then testified concerning A.B.'s current admission. She explained that A.B. was exhibiting unusual behaviors such as using hand gestures to communicate in a fashion similar to sign language; wearing a wrap on her head "to protect her privacy"; walking and turning as if she was "in marching band"; standing on her bed; and claiming she has a parasite in her body. *Id.* at 8. In addition, Dr. Cornett stated that A.B. was refusing medication because she did not believe she needed it and because she claimed the parasite would take the medication, not her. Dr. Cornett testified that A.B. exhibits no insight into her condition.

[8] Dr. Cornett acknowledged that A.B. was neither malnourished nor dehydrated when she was admitted to the Stress Center. She further testified that during the emergency detention, A.B. "takes care of her ADLs," meaning "activities of daily living," and specified that A.B. ate and showered. *Id.* at 9.

[9] A.B.'s mother testified that A.B.'s behavior the last few months has been "very erratic" and uncharacteristic. *Id.* at 22. After the admission to the Stress Center in August, A.B. was with her family on an out-of-town trip in September. During the trip, A.B. behaved erratically, was highly agitated, and admitted that she was "seeing and speaking with spirits." *Id.* at 24. Upon returning home, A.B. was admitted to Fairbanks Hospital for approximately a week. When she was released from Fairbanks, A.B. stayed with her parents for a couple of weeks before returning to her apartment.

[10] A.B.'s mother further testified that A.B. had reported applying for several jobs and had indicated she would be signing a singing contract, but nothing had "fallen into place." *Id.* at 26. She also testified that within the past six months A.B. had worked for a couple of weeks at a care group for autistic young adults.

[11] Lastly, A.B. testified. She explained that a particular event triggered her feelings of stress and fear that led to her August Stress Center admission but that she felt better when she was released. In contrast, she stated she felt "fine" and "completely coherent" at the time of her current admission. On the day of the hearing, she did not feel paranoid but rather she felt "[o]ptimistic" and "normal." *Id.* at 33.

[12] A.B. further testified that she had been tested for parasites and that she had a medical appointment scheduled in that regard. She testified the offer for a singing contract had been rescinded, but she was currently employed at a therapy center. She also testified that she is a registered behavior technician (RBT). While A.B. indicated she might be willing to try injectable medication, she definitely would be willing to take the oral medication she was given in August. On cross examination, A.B. disclosed that when her parents picked her up from the justice center, she had been arrested for trespassing in an incident involving a former co-worker.

[13] The trial court found that A.B. was gravely disabled and granted the Stress Center's request to temporarily commit A.B. for up to ninety days. A.B. now appeals.

# Discussion and Decision

## I. Mootness

Although A.B. timely appealed, her temporary commitment order has expired. Accordingly, the threshold issue is whether this appeal is moot. She argues we should reach the merits of her claim due to the possible enduring effects of her commitment. For its part, the Stress Center takes no position on this issue.

The long-standing rule in Indiana courts is that a case is deemed moot and should be dismissed when the controversy has been disposed of in some manner such that the court can give the parties no effective relief and thus it is unnecessary to decide the question at issue. *T.W. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 121 N.E.3d 1039, 1042 (Ind. 2019). Recently, however, this Court considered the merits of an appeal from an expired temporary commitment order based on the collateral consequences doctrine. *See Civ. Commitment of C.P. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 219 N.E.3d 142 (Ind. Ct. App. 2023). There, we applied the doctrine to hold that appeals from expired involuntary civil commitment orders are not moot but are properly before us on their merits based on the negative collateral consequences that accompany the orders. *See id.* at 148-49 (appellant demonstrated that, as collateral consequence of order, he would be prohibited from continuing his long-exercised right of possessing handgun). We subsequently clarified that "we should apply this doctrine only when the appellant demonstrates a *particularized* collateral consequence flowing from the temporary commitment

order." *J.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 222 N.E.3d 1020, 1024 (Ind. Ct. App. 2023) (emphasis added).

[16] Here, A.B. is concerned that this involuntary commitment will have a negative impact on her ability to maintain her RBT certification and will serve as the basis for future involuntary treatment. According to A.B., to maintain her certification she must report any mental health hospitalizations that impact her ability to provide services as a RBT. *See* Appellant's Br. pp. 12-13. Given these circumstances, A.B. has sufficiently shown a particularized harmful consequence is likely to result if we decline to reach the merits of her appeal. Therefore, we consider the merits of A.B.'s appeal based on the collateral consequences doctrine.

[17] Because we hold that A.B.'s potential loss of certification is sufficient to enable appellate review of her commitment, we need not consider her additional proffered collateral consequence that a valid commitment order would make future involuntary commitment proceedings against her more likely to succeed. We nevertheless note this Court has previously held this is not a sufficiently particularized harmful consequence to cause us to reach the merits of an appeal. *See J.F.*, 222 N.E.3d at 1024. We now turn to the merits of A.B.'s appeal.

## II. Sufficiency of Evidence

[18] A.B. contends the evidence was not sufficient to support the court's order of involuntary commitment. Civil commitment proceedings serve two purposes: (1) to protect the public and (2) to protect the rights of the person for whom

commitment is sought. *A.S. v. Indiana Univ. Health Bloomington Hosp.*, 148 N.E.3d 1135, 1138 (Ind. Ct. App. 2020). Because the liberty interest at stake in civil commitment proceedings encompasses more than a loss of one's physical freedom, such proceedings are subject to the requirements of the Due Process Clause. *Id.* (quoting *Civil Commitment of T.K. v. Dep't of Veterans Affs.*, 27 N.E.3d 271, 273 (Ind. 2015)).

[19] To comport with due process requirements, a commitment order must be supported by clear and convincing evidence. *A.S.*, 148 N.E.3d at 1139. On review of a determination made under such a standard, we will consider only the probative evidence as well as any reasonable inferences flowing therefrom, and we will not reweigh the evidence or reassess witness credibility. *Id.* As our courts have repeatedly stated, "'[t]here is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom.'" *In re Commitment of T.K.*, 993 N.E.2d 245, 249 (Ind. Ct. App. 2013) (quoting *Commitment of M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 97 (Ind. Ct. App. 2005), *trans. denied*), *trans. denied*.

[20] The Stress Center was required to prove by clear and convincing evidence that A.B. is (1) mentally ill, (2) either dangerous or gravely disabled, and (3) that her commitment is appropriate. *See* Ind. Code § 12-26-2-5(e) (2007). A.B. does not dispute the trial court's finding that she is mentally ill. However, she argues there was not sufficient evidence to support the trial court's conclusion that she is gravely disabled.

[21] "Gravely disabled" means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Ind. Code § 12-7-2-96 (1992). Because this statute is written in the disjunctive, a court's finding of grave disability survives if there was sufficient evidence to prove *either* that the individual was unable to provide for her basic needs *or* that her judgment, reasoning, or behavior was so impaired or deteriorated that she could not function independently.

[22] Here, the court found A.B. gravely disabled under Section 12-7-2-96(2), stating that "her judgment and reasoning is [sic] grossly impaired" because she was recently arrested, had been hospitalized twice in the previous six months for mental health concerns, believes she has a parasite that impairs her ability to metabolize her medications, has not had gas service in her apartment since July, exhibited bizarre behavior in the hospital, and, "in the face of all those things," states she feels fine. Tr. Vol. II, p. 52. In its written order, the court listed only A.B.'s belief that she was infested with a parasite, her opening of a car door on the highway, and her inability to restore her gas service. Appellant's App. Vol. II, p. 17.

[23] Although the court made its decision based on its belief that A.B.'s judgment was impaired under Section 12-7-2-96(2), the evidence included factors that pertain to the ability to care for oneself under Section 12-7-2-96(1). Because the court highlighted some of these factors in issuing its findings at the hearing and in its written order, we briefly address them here to provide a more complete picture of A.B.'s situation as shown by the evidence.

[24] By all accounts, A.B. lives in an apartment by herself. A.B. has her RBT certification and, although her mother was not aware of any current employment, A.B. testified she had returned to a previous job and was currently employed. A.B. confirmed that the gas service to her apartment had been discontinued because she was unable to pay the accrued arrearage in full; however, the unrefuted evidence is that the suspension of service was prior to A.B.'s mental health hospitalizations and was due to a misunderstanding on her part. A.B. testified that she was "unaware of the separation of the gas and electric bill so um upon receiving the notice that my gas was turned off um the bill had um, built up to a level that I was not able to pay in full." Tr. Vol. II, p. 42. A.B. further testified that she has access to food, usually through a church or food bank, and Dr. Cornett confirmed that when A.B. was admitted to the Stress Center, she was neither malnourished nor dehydrated. Dr. Cornett also acknowledged that A.B. saw to her activities of daily living by showering and eating.

[25] We turn now to the finding that A.B.'s judgment was impaired under Section 12-7-2-96(2). The court's determination was based in part on Dr. Cornett's

description of A.B.'s strange behavior at the Stress Center, A.B.'s belief she had been infected with a parasite, her recent arrest for trespass, and her mother's account of her opening the car door. Yet, our courts have echoed the caution called for by the United States Supreme Court in *Addington v. Texas*, 441 U.S. 418 (1979). As we have noted, the *Addington* Court expressed concern that a decision ordering an involuntary commitment might be made on the basis of a few isolated instances of unusual conduct that occurred within a range of generally acceptable conduct. *T.D. v. Eskenazi Health Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 511 (Ind. Ct. App. 2015) (quoting *In re Commitment of G.M.*, 743 N.E.2d 1148, 1151 (Ind. Ct. App. 2001)). The *Addington* Court opined that because everyone exhibits some abnormal conduct at one time or another, the loss of liberty that results from an involuntary commitment necessitates "'a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior.'" *Id.* A.B. insisted in the car door incident she was simply discarding something from the car. Nevertheless, it appears to be an isolated incident like the arrest, about which we have very limited information. And, while A.B.'s other behaviors and beliefs were unusual, there was no evidence that they prevented her from functioning independently. The Stress Center's burden of proof required more than a showing that A.B. behaved abnormally or idiosyncratically.

[26] Another circumstance that shaped the court's decision was A.B.'s failure to recognize her mental illness. However, our Supreme Court explicitly stated in *Civil Commitment of T.K.* that "denial of illness and refusal to medicate, standing

alone, are insufficient to establish grave disability because they do not establish, by clear and convincing evidence, that such behavior 'results in the individual's inability to function independently.'" 27 N.E.3d at 276 (quoting Ind. Code § 12-7-2-96(2)).

[27] Moreover, in a commitment proceeding, the burden on the petitioner under Section 12-7-2-96(2) is not to simply show impaired judgment that affects the ability to function independently. Rather, the statute mandates a showing that the individual *is in danger of coming to harm* as a result of the impaired judgment affecting her independent functioning. *See* Ind. Code § 12-7-2-96; *see also T.D.*, 40 N.E.3d at 512 (underscoring that definition of "gravely disabled" requires that individual "is in danger of coming to harm" as result of impaired judgment). A.B.'s behavior clearly evidences her mental illness and paranoia, but Section 12-7-2-96 requires more than paranoid beliefs and bizarre behavior to establish grave disability. The Stress Center was required to establish by clear and convincing evidence that, with her impaired judgment and behavior, A.B. could not function independently without coming to harm. The Stress Center failed in this regard; thus, we must conclude that A.B.'s civil commitment was improper.[1]

---

[1] Given that we conclude there was insufficient evidence to establish that A.B. was gravely disabled, we need not address her argument of the lack of clear and convincing evidence that her commitment was appropriate.

## Conclusion

[28] We therefore conclude that, based on the collateral consequences doctrine, A.B.'s appeal is not moot. In addressing the merits of the case, we conclude the Stress Center's evidence was not sufficient to support the temporary involuntary commitment of A.B. based on grave disability, and we reverse the trial court's decision and remand for the court to vacate the commitment.

[29] Reversed and remanded with instructions.

Riley, J., and Pyle, J., concur.

ATTORNEYS FOR APPELLANT

Talisha R. Griffin, Appellate Division Chief
Casey A. Farrington
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Andrew B. Howk
Matthew M. Schappa
Ryan A. McDonald
Hall Render Killian Heath & Lyman, P.C.
Indianapolis, Indiana